(No. 41084.—

ILLINOIS ROCKFORD CORPORATION, Appellant, *vs.* LEO KULP *et al.,* Appellees.

*Opinion filed November 22, 1968.*

Lee A. Freeman, of Chicago, for appellant.

Joseph D. Block, of Chicago, (Aaron, Aaron, Schumberg & Hess, of counsel,) for appellees.

Mr. Justice House delivered the opinion of the court:

This is an action for the rescission of a stock sale or, in the alternative, for damages arising out of defendant's alleged fraudulent representations, which induced plaintiff, Illinois Rockford Corporation (Rockford), to sell to defendant, Western Picture Frame Company, its 50% share of the capital stock of Pullman Couch Company (Pullman) for an inadequate price.

The cause was referred to a master in chancery (later appointed a special commissioner) who, after extensive hearings, filed a report recommending a decree awarding damages to the plaintiff in the amount of $112,500 as against all defendants jointly and severally. The decree adopted the findings, approved the commissioner's report and found against all defendants in the recommended amount, together with costs. The decree was appealed to the Appellate Court, First District, which reversed and remanded with directions. (88 Ill. App. 2d 488.) We granted leave to appeal.

Pullman and its subsidiaries in 1957 were engaged in the manufacture of furniture. In that year Rockford (which at all times in the transactions involved in this case was represented by its president and sole shareholder William A. Leeb) and Leo B. Kulp planned to acquire Pullman or its assets. Rockford and Kulp entered into an agreement dated September 16, 1957, setting forth their plans and commitments to each other relative to the matter. The agreement provided for either a partnership to operate Pullman's business or the continuation of Pullman in its corporate form. If the enterprise became a partnership, a wholly owned subsidiary of Rockford and Kulp were to be equal owners and equal partners; if the corporation was continued, Rockford and Kulp were to be equal owners of all shares of Pullman. Apparently for tax reasons, the partnership alternative was abandoned and the corporate form for the enterprise was used. Rockford paid $400,000 for one half of the stock of Pullman, and Kulp owned the other one-half. The agreement of September 16, 1957, further provided that Kulp and Rockford each were to name two directors of Pullman, Kulp was to become president in charge of operations, and Leeb chairman of the board in charge of marketing. Kulp was to devote full time to his duties, but Leeb was not required to do so. Each was to receive a substantial salary, although Leeb was to receive less than Kulp, and each was to be employed for a term of five years. These provisions of the agreement were put into effect.

In 1958, after an illness, Leeb spent most of his time in California, and, although he continued to maintain an office at the plant of Pullman and to keep himself informed as to Pullman's affairs, Kulp managed and controlled its operations. Although Pullman had enjoyed a number of years of profitable operations (after-tax consolidated earnings, for example, for the six fiscal years preceding 1958 ranged from a high in 1952 of $341,368.09 to a low of

$90,289.33 in 1957) nevertheless in 1958 it suffered a loss of $320,053.54. By April 1959, its financial condition was so serious and creditors were becoming so pressing that involuntary bankrupty became probable. Faced with this situation, Pullman on April 2, 1959, and its two subsidiaries (hereafter when "Pullman" is referred to it will include its subsidiaries) filed proceedings to effect an arrangement with creditors under chapter XI of the Federal Bankruptcy Act.

Notwithstanding Pullman's insolvency (both in the sense that it was unable to meet its obligations as they fell due and in the sense that its assets were less than its obligations) in view of the Company's history of successful operation the Pullman stock was not without value. It would be valuable to one who could settle its debts at substantially less than full value and who was willing to provide Pullman with sufficient funds to compromise with its creditors and provide adequate working capital. If a buyer were to be found, no time was to be lost since operations of Pullman were still being conducted at a loss with a consequent further drain on its assets. Joseph H. Schwartz, the attorney who represented the Pullman debtors in the bankruptcy action, cautioned that if a feasible plan of reorganization were not presented promptly to creditors, straight bankruptcy would result.

Kulp seems to have negotiated with several persons attempting to arrange a sale of all the stock of Pullman, both his and Rockford's. He informed Leeb that this was being done. He told Leeb that when he got a prospective purchaser who "looked like he was willing to come up with some money" he would report to him. The only persons Kulp was able to interest in the purchase of the stock were defendant Arthur Reinhold, who was in the furniture business in Chicago and who was president of and acting for the defendant Western Picture Frame Company, and defendant William Ray Jackson of Tennessee. A number of

conversations and meetings were participated in by Kulp with Reinhold and Jackson, which were not attended by Leeb. Reports of none of them were made to Leeb.

On April 21, 1959, Kulp and his attorney (who also represented Leeb) met with Reinhold and his attorney. At that meeting it was indicated by Kulp that Rockford's 50% of the stock might be acquired for $25,000, but Kulp made it clear that he expected more than that for his stock. He spoke of his "working interest" in Pullman being worth $250,000. No agreement was then reached. On April 30 or May 1, Leeb met with Jackson, Kulp and others at the Pullman plant in Chicago. Jackson offered $50,000 for all stock of Pullman. Kulp, out of Jackson's presence, recommended to Leeb that the offer be accepted, saying that he had interviewed other prospective buyers and had gotten nowhere with them. Leeb then discussed the situation alone with Jackson and inquired whether more than $25,000 was being paid Kulp. Jackson assured him that Kulp was receiving only $25,000 and that "we wouldn't do business behind your back." Leeb indicated willingness to sell for $25,000, but the sale was not then agreed upon because Jackson wished to explore the possibilities of a compromise with creditors of Pullman before committing for the purchase of Rockford's stock.

From the Pullman plant Kulp, Leeb and Jackson went to the Standard Club for luncheon. Schwartz also attended. Kulp and Leeb drove to this luncheon meeting together and during the drive Kulp again assured Leeb that the Pullman stock would bring only $50,000 and that he was getting no more than $25,000 for his. Kulp mentioned that he was trying for an employment contract with the reorganized company, not indicating this to be a condition to the sale of his stock, thus leaving the impression that this was a completely independent transaction from the sale of his stock. The luncheon meeting, however, seems to have been for the principal purpose of exploring what percentage of

their debts the creditors of Pullman would require before approving a composition of creditors. At that meeting Schwartz emphasized the necessity of effecting promptly a plan of reorganization to avoid straight bankruptcy. Jackson suggested offering the creditors ten cents on the dollar, but Schwartz felt that to be insufficient and expressed the view that twenty cents on the dollar would secure the creditors' consent.

In the afternoon of the same day Kulp, Jackson, Leeb, Schwartz and others, attended a meeting with representatives of the creditors of Pullman. Jackson offered these representatives ten cents on the dollar. This was refused, but the creditors' representative thought "20-20-50" (20 cents on the dollar for Pullman and one subsidiary and 50 cents on the dollar for the other subsidiary) would be acceptable to creditors. The meeting terminated without agreement. Although no compromise with creditors was effected at this meeting, Jackson obviously left the meeting knowing with reasonable certainty the amount which would satisfy the creditors. On the same or the next day, Jackson indicated acceptance of the "20-20-50" compromise, and the creditors' representatives agreed to recommend it to the creditors.

Leeb, as a result of his talks with Kulp and Jackson, was led to and did believe that $25,000 was the best deal available for Rockford's stock. He pressed to get that amount. On Sunday morning, May 3, Jackson and Kulp purchased Leeb's stock for $25,000.

Following a series of negotiations, on Monday, May 4, Kulp and his counsel met with Reinhold and with counsel representing both Reinhold and Jackson. The result of this and earlier conferences carried on before and after Rockford's shares in Pullman were purchased for $25,000, resulted in an option agreement dated May 7, 1959, which accorded Jackson and Reinhold an option to acquire Kulp's stock. It was exercised on June 18, 1959. Pursuant to the terms of the option and its exercise Kulp received $25,000

expressed to be the consideration for his stock. He also received an employment contract with Pullman for one year with compensation at the rate of $40,000 per year. In addition, he received Pullman's agreement to pay him 10% of the net profits of Pullman earned after the termination of his employment up to $225,000 payable annually after such termination, but limited to $40,000 in any year. This profit-sharing arrangement became effective upon the termination of Kulp's employment, whether the termination was due to his own resignation, illness, death or discharge by Pullman, and in the event of his death the profit-sharing arrangement was to continue for the benefit of his personal representatives. The agreement did provide that Kulp was to be available for consultation, but it made no specific provision for termination even though he refused to do so. Kulp's period of employment was very brief. He started his duties August 1, 1959, submitted his resignation in September, 1959, and ceased work at the end of 1959. On January 25, 1960, after this suit was filed and depositions taken, Kulp released Pullman from the profit-sharing agreement for $10,000 and on the same day Jackson and Reinhold paid Kulp $60,000 for nonvoting stock in a Florida venture of Kulp. Each paid the same percentage (60-40) for this stock as their proportion of Pullman stock acquired.

A number of conclusions are inescapable. First, Kulp wanted more than $25,000 for his stock. Second, Jackson and Reinhold knew this and were willing to give him consideration in addition to $25,000 in order to obtain all of the stock. Third, Kulp by his statements that he was receiving only $25,000 for his stock and Jackson (representing himself and Reinhold) stating that they would pay no more than $25,000 for Kulp's stock and would not deal behind his back, were intended to create and undoubtedly did create in Leeb's mind a false impression as to the then value of that stock and what he might obtain for it. Fourth,

the profit-sharing agreement was not a consideration to Kulp for accepting employment with Pullman, but was consideration in addition to the cash paid for his stock.

The question is raised as to whether a fiduciary relationship existed between Kulp and Leeb. While this court has from time to time set out factors and circumstances to be considered in ascertaining whether a fiduciary relationship in fact exists, we have consistently refused to set out their precise boundaries. (*Landau* v. *Landau,* 20 Ill.2d 381; *Seely* v. *Rowe,* 370 Ill. 336.) "A fiduciary relation exists in all cases in which a confidential relationship has been acquired. The origin of the confidence is immaterial. It may be moral, social, domestic, or purely personal." (*Pfaff* v. *Petrie,* 396 Ill. 44, 50;" see also C.J.S. Vol. 36a pp. 387, 388.) In *Tilley* v. *Shippee,* 12 Ill.2d 616, at page 624, we said: "Their decision to form and operate as a corporation rather than a partnership does not change the fact that they were embarking on a joint enterprise, and their mutual obligations were similar to those of partners." See also *Helms* v. *Duckworth* (D.C. cir.), 249 F.2d 482; *Sher* v. *Sandler,* 325 Mass. 348, 90 N.E. 2d 536.

The inception of the Pullman venture between Rockford (always represented by Leeb) and Kulp, the circumstances of their participation in it and of the negotiations for the sale of the stock, required Kulp to deal openly and honestly with Leeb in connection with the bankruptcy proceedings and the sale of the Pullman stock. Kulp and Leeb had been close business and personal friends for a long period of time. Each did not proceed independently of the other to acquire the Pullman stock. They entered into pre-acquisition agreements at a time when it was undetermined whether to operate under the corporate form or as a partnership. If tax advantages appeared to result, they were quite willing to eliminate the corporation and operate the venture as partners. It was agreed that Kulp and Leeb were

to become the principal officers of the corporation and that they were to confer on all major company policies.

When financial difficulties occurred, Leeb was in California. Kulp was in Chicago and searched for prospective buyers for all the stock and negotiated with those whom he could interest. He told Leeb that when he got a purchaser who looked like he was willing to come up with some money he would inform Leeb which, in our view, was equivalent to assuring Leeb that he would fully report on all negotiations with persons seriously interested in buying any or all the stock of Pullman. Not only did Kulp fail to make a full and honest disclosure of his negotiation with Reinhold and Jackson, but he seriously and materially misled Leeb when he advised him that in his (Kulp's) judgment $50,000 was all that could be obtained for the stock and that he was receiving no more than $25,000 for his shares. At the same time he was negotiating for a consideration in addition to $25,000 for himself and he must have known that he had good prospects of getting it. We hold that Kulp stood in a fiduciary relationship to Leeb and Rockford, that he failed to deal openly and honestly with Leeb, and that, in fact, his conduct was fraudulent.

We are of the opinion that Jackson and Reinhold were aware of and knew of the close relationship between Kulp and Leeb, and that Leeb was placing confidence in Kulp's judgment as to the value of the Pullman stock and that they co-operated and aided Kulp in breaching that confidence. It should have been, and no doubt was, plain to them that if Kulp judged his shares worth more than $25,000 Leeb would judge likewise, and that if Kulp was asking more Leeb would also. Jackson's answer to Leeb's inquiry, as to whether Kulp was getting the same amount as Leeb, was that Kulp was to receive only $25,000 and that Jackson and his associate would not do business behind Leeb's back. We believe this was intended to convince Leeb of an exist-

ing situation that was not true; namely, that Kulp had negotiated with Jackson and Reinhold and was agreeable to taking that amount for his stock. We conclude then that this statement was much more than a mere promise to be fulfilled in the future or a statement of contingent events, expectations or probabilities. This case is clearly distinguishable from the rationale of such cases as *Brodsky* v. *Frank,* 342 Ill. 110, and *Sinclair* v. *Sullivan Chevrolet Co.,* 31 Ill.2d 507. In addition, the recognition by Jackson that paying more than $25,000 for Kulp's stock was wrong, was evident when he helped cover Kulp's dealings and thereby kept Leeb ignorant of the true facts. Finally, in order, we suppose, to make the record appear consistent with their statements that only $25,000 was being paid for the Kulp stock, Jackson and Kulp disguised the additional consideration flowing to Kulp as a profit-sharing agreement for services rendered to Pullman by Kulp.

"[F]raud may be inferred from the nature of the acts complained of, the individual and collective interest of the alleged conspirators, the situation, the intimacy and relation of the parties at the time of the commission of the acts, and generally all the circumstances preceding and attending the culmination of the claimed conspiracy." (*Majewski* v. *Gallina,* 17 Ill.2d 92, 100; see also 37 Am. Jur. 2d, Fraud and Deceit, sec. 305.) In our opinion the record amply sustains the finding that Reinhold and Jackson co-operated, aided, conspired and participated with Kulp in the latter's violation of his fiduciary duty. Those two individuals and Reinhold's principal, Western Picture Frame Company, were parties to the fraud and are jointly and severally with Kulp answerable for damages to plaintiff, Illinois Rockford Corporation, Leeb's company.

We agree with the trial court that rescission is not an appropriate remedy in this case. Defendants, while contending that the evidence was insufficient for assessing any damages against them, assert that in any event the damages

recommended and approved by the trial court were excessive.

It is argued that at the time Rockford's Pullman stock was purchased, Reinhold and Jackson had not agreed with Pullman's creditors as to the amount they would accept, while Rockford received $25,000 with no conditions attached. Kulp gave an option which clearly would not have been exercised if a satisfactory settlement with creditors were not effected. Thus, it is argued that Kulp was entitled to receive more for his stock than Leeb. This argument is unsound since when Leeb concluded the sale of Rockford's stock on May 3, Jackson and Reinhold had every reasonable assurance at least that the "20-20-50" settlement could be effected. We view the risk negligible, at the time of the purchase of Rockford's stock on May 3, that an arrangement with creditors satisfactory to Jackson and Reinhold would not be affected.

It is also contended that the evidence was insufficient to support the award of damages of $112,500. The special commissioner concluded, and this was adopted by the trial court, that the total agreed to be paid for all the shares of Pullman by Jackson and Reinhold was $50,000 plus an additional $225,000 to be paid from profits, or a total of $275,000 for 100% of the stock. One half of that, less the $25,000 already received by Rockford, was the amount the special commissioner concluded to be due to Rockford. It is clear that this profit-sharing agreement was an important consideration for Kulp's stock. Pullman was an attractive investment to Jackson and Reinhold. It had a good name in the trade and if properly financed and managed must have had good prospects of being profitable and successful. This is confirmed by the facts that Jackson and Reinhold were willing to pay a substantial consideration for its stock, that Pullman was able to attract $600,000 in additional capital in connection with the reorganization and that, after reflecting the composition with creditors after issuance of

$600,000 in debentures, the book value of gross assets was more than $1\frac{1}{3}$ million dollars and net book value was $514,176.39, according to the consolidated balance sheet as of June 30, 1959. An unconditional claim upon Pullman's future profits whenever earned was of very substantial value both at the conclusion of the reorganization and at the time when Kulp received it. To attribute with reasonable certainty a dollar value to it is difficult, if not impossible. This difficulty is inherent in the type of transaction set up by Kulp and we are not inclined to disturb the damages awarded by the trial court.

The judgment of the Appellate Court, First District, remanding the case to the trial court with instructions is reversed, and the decree of the circuit court of Cook County is affirmed.

*Appellate Court reversed;*
*circuit court affirmed.*