(No. 50922.— )

EUGENE C. SWAGER *et al.*, Appellants, v. PETER J. COURI *et al.*, Appellees.

*Opinion filed October 2, 1979.*

Davis & Morgan, of Peoria (Bret S. Babcock, of counsel), for appellants.

Bernardi, Ault, & Bode, of East Peoria (C. Brett Bode, of counsel), for appellees.

MR. JUSTICE CLARK delivered the opinion of the court:

This action arose out of the brief life and untimely death of an Illinois corporation, Fondulac Nursing Manor, Inc. (Fondulac). The plaintiffs are partners in the architectural firm of Phillips Swager Associates (Swager), which had, pursuant to a contract, rendered services to Fondulac. The defendants, Dr. Peter J. Couri, Jack W. Riley and Carl F. Reardon, were officers, directors and shareholders of Fondulac. The gravamen of plaintiffs' complaint is that, in dissolving Fondulac, the defendants tortiously interfered with the contractual relationship between Fondulac and Swager. A jury in the circuit court of Peoria County apparently agreed, and returned a verdict for the plaintiffs and against the defendants in the amount of $27,000 actual damages and $111,000 punitive damages. The circuit court entered judgment on that verdict and denied

defendants' post-trial motion, but on appeal, the Appellate Court, Third District, reversed (60 Ill. App. 3d 192), holding that plaintiffs had failed to plead and prove an essential element of the tort alleged, *i.e.,* malice or lack of justification. (See, *e.g., H. F. Philipsborn & Co. v. Suson* (1974), 59 Ill. 2d 465, 474.) We granted plaintiffs' petition for leave to appeal, and we now affirm.

Early in 1969, two old friends, Charles Blye, an architect and partner in Swager, and Jack W. Riley, a real estate salesman and broker, met to discuss the possibility of constructing a nursing home in East Peoria. Because of his friendship with Riley, and because the Swager firm previously had been employed by Riley's co-venturer, Dr. Peter J. Couri, Blye had reason to expect that Swager would be retained as architect for the project although no formal agreement was reached. Accordingly, when Riley told Blye that the proposed site would have to be rezoned to permit construction of a nursing home, Blye agreed to prepare a sketch of the site for use in connection with the necessary zoning change. Blye also appeared with Riley before the East Peoria zoning board. The necessary zoning change was granted, and, on May 22, 1969, Blye met at the site with Couri, Riley and a representative of the State of Illinois in connection with an application for a "certificate of need" from the State for the project. Blye also accompanied Riley in visiting with officials of the Federal Housing Administration (FHA) in Springfield, in connection with an application for financing.

At the May 22 meeting at the site, defendants Couri and Riley told Blye that they planned to put together a group of investors to raise capital for the project, and on July 16, Blye met with such a group at the office of Swager, where Couri asked Blye to serve as architect for the investors.

Sometime in August 1969, Blye, on behalf of Swager, submitted to Couri a "Standard Form of Agreement

Between Owner and Architect" (American Institute of Architects, Document B—131, copyright 1967). It is not clear from the record whether Swager expected Couri to execute the agreement personally, on behalf of a corporation to be formed, or as trustee of a land trust, but, in any event, Couri declined to execute the agreement at that time, despite repeated requests. He later testified that his refusal was prompted by a desire to first explore the possibility of forming a corporation to undertake the project and, presumably, the contract. Nonetheless, on December 16, 1969, at another meeting held in the offices of Swager, Blye agreed on behalf of Swager to undertake the "schematic design" portion of the project, even though the agreement had not yet been executed.

On March 26, 1970, Couri, as incorporator, filed with the Secretary of State articles of incorporation for the corporation to be known as Fondulac Nursing Manor, Inc. That same day, pursuant to section 48 of the Business Corporation Act (Ill. Rev. Stat. 1969, ch. 32, par. 157.48) (the Act), the Secretary of State issued Fondulac's certificate of incorporation. Although the certificate of incorporation lists Couri as the sole, original subscriber to shares of Fondulac, he apparently assigned some of his subscription rights to 12 others. The minutes of the initial meeting of directors held on April 22 indicate that the 13 subscribers, who also were the beneficiaries of the land trust which had been established to purchase the land for the project, each caused $100 to be paid for his shares from funds which he had contributed to the land trust. Fondulac thus received its initial capital of $1,300, satisfying the statutory requirement of the receipt of at least $1,000 in initial capital before the commencement of business. Ill. Rev. Stat. 1969, ch. 32, par. 157.42—5.

Blye, who attended the meeting on behalf of Swager, informed the directors that Swager already had about $5,000 worth of time invested in the project, but that its

fee for this time was subsumed in the overall fee structure of the agreement. The directors ratified Couri's prein-corporation actions as promoter and authorized execution of the agreement with Swager, and Couri executed the agreement on behalf of Fondulac that same day. Blye was, however, told to suspend further work on the project pending the FHA's approval of the application for financing.

The agreement provided that, unless Fondulac negotiated the construction contract itself (which it did not), Swager's fee would be equal to 7% of the project's estimated construction cost, and that, in the event the project was suspended or abandoned, Swager would receive a portion of its fee calculated according to the portion of its work which had been completed. Toward that end, the agreement divided the architectural work into phases, assigning a specified portion of the total job (and, by implication, the total fee) to each phase:

| | |
|---|---|
| Schematic Design Phase | 15% |
| Design Development Phase | 20% |
| Construction Documents Phase | 40% |
| Bidding or Negotiation Phase | 5% |
| Construction Phase | 20% |

The agreement also provided for interim payments to Swager to be credited against its fee, and to be calculated at 2½ times Swager's "direct personnel expense" in connection with time expended on behalf of Fondulac for the preceding period. However, Swager deliberately billed Fondulac at a lower rate, in an effort to help the project "get underway."

The project never was completed, however. The FHA apparently never approved the application for financing, and in October 1970 all of the investors except Riley and Couri withdrew. Plaintiffs proffered evidence which, if admitted, might have tended to show that the reason for the investors' withdrawal was a dispute over the fairness of

the price at which Riley and Couri proposed to sell the land for the project, which they owned, to either the land trust or the corporation (Fondulac). Nonetheless, Riley and Couri assured Swager that they intended to bring the project to fruition, and asked for additional time to raise the necessary capital.

Sometime during this period, it is stipulated, Reardon became an officer, director and shareholder of Fondulac. Almost 3 years had passed when, in late August or early September 1973, Reardon met with Blye in the offices of Swager's attorneys, telling them that Fondulac had been insolvent for 2 years, and either was being dissolved already or would be dissolved shortly. On September 11, 1973, Couri, Riley and Reardon filed with the Secretary of State a "Statement of Intent to Dissolve [Fondulac] by Voluntary Action of the Corporation Pursuant to Section 76 of the 'Business Corporation Act'." Although section 79(a) of the Act required that notice of the filing (of the statement of intent to dissolve) "be mailed to each known creditor of the corporation" (Ill. Rev. Stat. 1973, ch. 32, par. 157.79(a)), no such notice was mailed to Swager.

On September 26, 1973, Couri, Riley and Reardon filed articles of dissolution with the Secretary of State. Despite the existence of the debt outstanding to Swager, the articles (which were on a standard, printed form signed and sworn to by Riley, and attested to by Reardon) recited that, as required by section 80 of the Act, "all debts, obligations and liabilities of the corporation have been paid and discharged or that adequate provision has been made therefor." Ill. Rev. Stat. 1973, ch. 32, par. 157.80.

The defendants eventually did build a nursing home on the same site as that proposed for the Fondulac home, but they used a Nevada corporation, and a different architectural firm. In the meantime, however, Fondulac was dissolved, Swager remained unpaid, and this suit

followed.

Plaintiffs' threshold argument in this court is that the appellate court erred in reviewing the adequacy of their complaint because no objection thereto was made until defendants' post-trial motion. We disagree. A defendant's failure to object to the complaint prior to verdict does not completely waive the question of whether the complaint failed to state a cause of action. Rather, such a failure merely changes the standard by which the adequacy of the complaint is determined. (*Lasko v. Meier* (1946), 394 Ill. 71, 73-74; see also *Parrino v. Landon* (1956), 8 Ill. 2d 468, 473-75.) "A somewhat liberal rule is frequently applied in construing a declaration or complaint where the objection is made for the first time after verdict or judgment, and it may be sufficient if the facts essential to a cause of action appear by reasonable implication only, or that the allegations are in the form of a legal conclusion which merely implies the necessary material facts. [Citation.] " (*Parrino v. Landon* (1956), 8 Ill. 2d 468, 475.) The reason for the above-quoted rule is obvious, upon reflection. If the defendant had filed a timely motion (pursuant to section 45 of the Civil Practice Act (Ill. Rev. Stat. 1975, ch. 110, par. 45)) objecting to the pleadings, plaintiff would have had an opportunity to amend the complaint in response thereto. (*Berry v. G. D. Searle & Co.* (1974), 56 Ill. 2d 548, 556; *Central Illinois Electric & Gas Co. v. Scully* (1959), 17 Ill. 2d 348, 353.) Nonetheless, to hold a defendant liable without notice of the conduct, alleged to give rise to liability, would be an unnecessarily harsh sanction.

Neither of the cases relied upon by plaintiffs, *Berry v. G. D. Searle & Co.* (1974), 56 Ill. 2d 548, 556, and *Hild v. Avland Development Co.* (1977), 46 Ill. App. 3d 173, 177, supports so harsh a rule. In *Berry* the circuit court had dismissed the complaint, based on the expiration of what it believed to be the applicable statute of limitations. In

defending that dismissal, the defendant sought to allege that the complaint (which was based on breach of warranty under section 2—315 of the Uniform Commercial Code (Ill. Rev. Stat. 1965, ch. 26, par. 2—315)) failed to allege an essential element of the cause of action (*i.e.*, notice as required by section 2—607(3)(a) of the Uniform Commercial Code (Ill. Rev. Stat. 1965, ch. 26, par. 2—607)). This court rejected that argument, noting that plaintiffs never had an opportunity to amend their pleadings. Such is not the case however, where, as here, defendants' challenge comes in a post-trial motion, because even then, the plaintiff may, pursuant to section 46(3) of the Civil Practice Act (Ill. Rev. Stat. 1975, ch. 110, par. 46(3)), amend his complaint to conform to the proof adduced at trial. See *First National Bank v. City of Aurora* (1978), 71 Ill. 2d 1, 8.

Similarly, in *Hild v. Avland Development Co.* (1977), 46 Ill. App. 3d 173, 175, the appellate court held that where defendants waited until nearly 4 years after the complaint was filed (and 3½ years after their answer was filed) to claim that plaintiffs failed to allege facts establishing the inadequacy of their remedy at law, and where, in their post-trial motion, defendants merely stated that the complaint failed to allege a cause of action, the defendants waived their objection to the jurisdiction of a court of equity. To the extent that we find the appellate court's decision persuasive here, we consider it limited to the question of the timeliness of challenges to equity jurisdiction, rather than, as plaintiffs would have us hold, establishing a harsh and far-reaching rule of waiver.

Here, defendants' post-trial motion alleged not only that the complaint failed to state a cause of action, but also "[t]hat a defendant does not incur liability for intentional interference with contractual relations if he is justified in his interference." While we agree that, in context, there was some ambiguity as to whether this

statement refers to an element of plaintiffs' cause of action or defendants' affirmative defense, both the trial court and plaintiffs must be presumed to have known that lack of justification was an element of plaintiffs' case, not defendants', and that the above-quoted statement in defendants' post-trial motion, therefore, must be construed as having adequately brought the issue to the attention of the trial court. Accordingly, we return to the question of the standard by which the complaint must be judged when first challenged in a post-trial motion.

The general rule in Illinois, as exemplified by *Lasko v. Meier* (1946), 394 Ill. 71, 73-74, was that, under the doctrine of *aider by verdict,* "[a] verdict will cure not only all formal and purely technical defects and clerical errors in a complaint, but will also cure any defect in failing to allege or in alleging defectively or imperfectly any substantial facts which are essential to a right of action, if the issue joined is such as necessarily requires, on the trial, proof of the facts so omitted or imperfectly stated and if such facts can be implied from the allegations of the complaint by fair and reasonable intendment." Accordingly, "[t]he question whether a complaint discloses a cause of action is always open to consideration in a court of review. *There is a substantial and material difference between a complaint which alleges no cause of action and which may be questioned at any time and one which defectively or imperfectly alleges a cause of action and is good after verdict.*" (Emphasis added.) (394 Ill. 71, 75.) The "substantial and material difference" often proved elusive, however, leading this court to observe, 10 years later:

"There are numerous foreign and Illinois cases which have dealt with the problem of whether certain complaints have stated a good cause of action defectively or stated no cause of action at all. A careful analysis of a great many of

these cases gives rise to a serious doubt as to the proper basis for decision and one becomes somewhat confused by conflicts that appear irreconcilable. A black or white label can be applied either way. The path of proper direction for future travelers along this course is rendered no less hazardous by compounding the confusion by a mere choice of labels." *Parrino v. Landon* (1956), 8 Ill. 2d 468, 471-72.

The court therefore articulated a new standard, holding that where a defendant has allowed the cause to proceed to verdict, scrutiny of the complaint is limited to the question of whether it gave the defendant adequate notice of the facts which the plaintiff would attempt to prove (8 Ill. 2d 468, 473-74), and that legal conclusions, when pleaded, were, for this purpose, sufficient to give the defendant notice of facts necessary to support such conclusions. (8 Ill. 2d 468, 475.) In *Parrino* the court applied this standard to find that the complaint gave the defendant adequate notice that some form of vicarious liability was alleged, where it alleged a relationship between the defendant and the active tortfeasor but did not allege specific breach of duty on the part of the defendant himself. (8 Ill. 2d 468, 474-75.) Here, where the complaint clearly intended to charge tortious interference with contractual relations, defendants, like the plaintiffs and trial court in reviewing a post-trial motion, must be presumed to be aware that an element of the tort was "lack of justification," and that facts proving that element would be adduced. Accordingly, we reverse the appellate court's finding, based on *Lasko v. Meier,* that the complaint was defective.

Our analysis cannot stop here, however, for it is the judgment, not the reasoning of the appellate court, which is before us, and it is our duty to examine other grounds properly preserved and presented to this court in support

of the appellate court's decision, where it is clear that a remand of the issue to the appellate court would serve no purpose. There is such an alternative ground presented here. Defendants allege that not only was there a complete failure to plead lack of justification, but also a complete lack of proof on this issue at trial, which therefore should have resulted in a judgment *n.o.v.* in their favor. Specifically, citing *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510, they claim that all of the evidence, viewed in its aspect most favorable to the plaintiffs, so overwhelmingly favors the defendants on this question that no contrary verdict based on that evidence could ever stand. We agree.

Tortious interference with contractual relations has a long and colorful history, much of which can be traced in W. Prosser, Torts 927-45 (4th ed. 1971). The seminal decision was handed down in the English case of *Lumley v. Gye* (1853), 118 Eng. Rep. 749. There, a third party was held liable for "maliciously" inducing an opera singer to break her exclusive contract with a theater owner. Many early American cases sought to invoke the tort to frustrate efforts to organize workers into labor unions for collective bargaining, an application now foreclosed by Federal labor law. (See O. K. Fraenkel, *Recent Statutes Affecting Labor Injunctions and Yellow Dog Contracts,* 30 Ill. L. Rev. 854 (1936).) The earliest reported case in this court is that of *Doremus v. Hennessey* (1898), 176 Ill. 608. There, Hennessey conducted a "laundry office" in Chicago, receiving clothes to be laundered, which she in turn forwarded to operating laundries, and which, when returned to her, she delivered to her customers. Because she refused to engage in what today would be called a "price fixing conspiracy" by the Chicago Laundrymen's Association, the officers of that Association induced the operating laundries to violate their contracts with her. This court, in the era of the enactment of the Sherman Act of 1890 (15

U.S.C. sec. 1 *et seq.*), and the Illinois antitrust act of 1891 (1891 Ill. Laws 206), had no difficulty in finding the conduct of the officers actionable. But compare *Chicago Laundry Owners Association v. American Wet Wash Laundry, Inc.* (1934), 276 Ill. App. 604 (abstract), with *Cleaning & Dyeing Plant Owners Association v. Sterling Cleaners & Dyers* (1936), 285 Ill. App. 336 (common law, rather than statute, held to have prohibited certain restraints of trade in service industries).

Much more difficult questions are posed, however, when a director, officer or shareholder of a corporation is alleged to have tortiously interfered with the corporation's contractual relations. What may at first blush appear to constitute the misuse of the corporate form as a device to defraud the unwary, may also, on closer inspection, be revealed to involve more subtle questions of the scope of the concept of "limited liability" as it applies to investors and managers of closely held corporations; and of the duties and reasonable expectations of persons negotiating arm's-length agreements in the robust environment of daily commercial life.

The leading case in this court is that of *Loewenthal Securities Co. v. White Paving Co.* (1932), 351 Ill. 285, 299-301. In that case, the plaintiff, Loewenthal Securities Company (Loewenthal) was engaged in the business of buying and selling municipal bonds, including local improvement bonds. The defendant, Michael E. White, and his relatives owned all but a few shares of two companies, White Paving Company (Paving) and White Construction Company (Construction). Loewenthal and Paving entered into a contract whereby they agreed that Loewenthal would purchase, at a specified discount, most of the bonds and vouchers issued to Paving by the city of Chicago in payment for Paving's work on a specified class of projects. Loewenthal had no such agreement with Construction. White, through a subordinate, told an officer of Loewen-

thal that unless Loewenthal agreed to waive its rights under the agreement with respect to any securities issued in connection with the new Broadway sewer project; Paving would refuse to bid on the project, but Construction would bid. Loewenthal refused to waive its rights under the agreement; Paving refused to bid; Construction got the job (and gave very little subcontracting work to Paving), and Loewenthal charged that White and others had tortiously interfered with its contractual relationship with Paving. This court disagreed.

The court first noted that neither White nor Construction was a party to the contract and bound thereby. (351 Ill. 285, 295.) The court next noted that Paving had neither expressly nor impliedly promised to bid on any particular project (nor was it particularly well suited to complete the Broadway sewer project) and that therefore no contractual relationship had been interfered with, tortiously or otherwise. (351 Ill. 285, 297-99.) Finally, the court reached an alternative argument, desiring to make clear that "[a] side from this, however, the evidence in this record cannot sustain the decree on the theory of a tort cause of action for damages." (351 Ill. 285, 299.) "White and the other officers of the two defendant corporations, who were responsible for the failure of the paving company to submit a bid and for inducing the construction company to bid, were not outsiders intermeddling maliciously in the contracts or affairs of other parties. They were privileged, as other corporate officers, to act for their corporations in accordance with their business judgment and discretion." (351 Ill. 285, 300.) *Loewenthal* therefore held that corporate officers who, "in accordance with their business judgment and discretion," interfere with their corporation's contractual relations lack the requisite "malice" and therefore are not liable in tort. 351 Ill. 285, 300.

As this court observed in *H. F. Philipsborn & Co. v.*

*Suson* (1975), 59 Ill. 2d 465, 474, "[A] corporate officer may, for a proper business purpose and in good faith, influence the actions of the corporation. (*Loewenthal Securities Co. v. White Paving Co.,* 351 Ill. 285.)" Thus, to be tortious, a corporate officer's inducement of his corporation's breach of contract must be done "without justification or maliciously" (59 Ill. 2d 465, 474). In *Philipsborn,* where the defendant officer sought to obtain a loan for his corporation on better terms than those in the contract allegedly broken, the requisite malice or lack of justification was held to be lacking. See also *Petit v. Cuneo* (1937), 290 Ill. App. 16 (stockholder influenced directors to reduce plaintiff's compensation).

Plaintiffs, however, would have us construe *Loewenthal* and *Philipsborn* very narrowly, claiming that the privilege of a corporate officer to exercise "business judgment and discretion" does not apply to the defendants' decision to dissolve Fondulac. We disagree.

The purpose of imposing liability in tort upon persons who interfere with the contractual relations of others is to protect one's interest in his contractual relations against forms of interference which, on balance, the law finds repugnant. (See *Doremus v. Hennessy* (1898), 176 Ill. 608, 615.) This statement of the tort's purpose itself sows the seeds of the further analysis necessary to determine whether particular conduct ought to give rise to liability. The question presented, therefore, is whether protection of the particular contractual interest at issue merits prohibition of the particular conduct at issue. See generally Restatement (Second) of Torts sec. 767 (1979). Accord A. Avins, *Liability for Inducing a Corporation to Breach Its Contract,* 43 Cornell L.Q. 55, 57-64 (1957).

Viewed in this light, it is relatively easy to see why we find the plaintiffs reliance upon, for example, *W. P. Iverson & Co. v. Dunham Manufacturing Co.* (1958), 18 Ill. App. 2d 404, both unpersuasive and misplaced. *Iverson*

purported to limit the right of shareholders to influence the management of their corporation only to that influence exerted "in good faith," claiming that "[i] t was not lawful if it was maliciously exerted in order that the corporation might escape the obligation of a contract." (18 Ill. App. 2d 404, 419, relying upon *Republic of Italy v. De Angelis* (2d Cir. 1953), 206 F.2d 121 (Clark, J., concurring).) This so-called "exception" to the limited liability of corporate shareholders for corporate contractual obligations is an exception which would quickly swallow the rule itself in the case of most closely held corporations. Further research indicates that while certain Federal courts have done so, this court has never relied upon *Iverson* nor, for that matter, even cited it, in the 20 years since it was decided.

To distinguish between actions "in the corporate interest" and actions "in the shareholders' interest" when defining the scope of the directors' privilege to influence the action of their corporation would be to create a duty to the corporation's contract creditors which would take precedence over their duty to their shareholders. This we decline to do. (See generally A. Avins, *Liability for Inducing a Corporation to Breach Its Contract*, 43 Cornell L.Q. 55, 64 (1957).) At least in the context of the corporate officers', directors' and shareholders' privilege to influence the actions of their corporation, death is just another part of life, and the rights and duties of the parties to the dissolution of an Illinois corporation are normally defined by the Business Corporation Act, not by the common law of torts.

Defendants' liability under the Act bears little resemblance to that which plaintiffs seek to impose in this case. For example, under section 42.3 of the Act (Ill. Rev. Stat. 1971, ch. 32, par. 157.42—3) a corporation may recover from directors any assets improperly distributed upon dissolution. Here, even if the defendants did receive

any corporate assets (their testimony on this point is somewhat vague and inconsistent), the most they could have received was some portion of the corporation's initial capital of $1,300, which, under section 42.3 therefore also would have been the measure of their liability. Plaintiffs, however, seek to impose liability in tort in excess of 100 times the defendants' statutory liability.

Similarly, defendants' liability under section 42.6 of the Business Corporation Act (Ill. Rev. Stat. 1973, ch. 32, par. 157.42–6) for failure to send plaintiffs written notice of the proposed dissolution is limited to any harm caused by such lack of notice. No such harm has been demonstrated here, where plaintiffs had actual notice of the dissolution. Even if any harm was caused, it, too, on this record, was limited to the value of the assets, if any, improperly distributed upon dissolution.

Finally, defendants actions in signing and swearing to the truth of the contents of a standard form containing an inaccurate statement as to provisions for the satisfaction of the corporation's debts do not support the liability here sought to be imposed. Even if this statutory provision were held to provide the basis for an implied cause of action in tort (an issue not properly before us), the liability thereby imposed would, in light of the overall statutory scheme, be limited to the actual damages caused by the false statement. Again, no such damage was caused here, where the continued existence of the corporation would have left the plaintiffs in no better position than they stand today.

This is not an unfair result. The plaintiffs were intimately familiar with the genealogy of the thinly capitalized corporation to which they would have to look for their fee. They knew that defendant Couri had expressly refused to assume personal liability on the contract. In the hope of earning a very substantial fee, the plaintiffs took a very substantial risk on the success of a highly speculative venture, and on the character of the

defendants. That their judgment apparently was wrong on both counts is not a basis for liability in tort.

For the foregoing reasons, the judgment of the appellate court is affirmed.

*Judgment affirmed.*