Thomas H. CAFCAS, Jr., Plaintiff,

v.

DeHAAN & RICHTER, P.C.; Ronald M. DeHaan; Paul J. Richter; Kenneth L. Coughlan; Ronald S. Zweig & Co., P.C.; and Ronald S. Zweig, Defendants.

DeHAAN & RICHTER, P.C.; Paul J. Richter; and Ronald M. DeHaan, Counterplaintiffs,

v.

Thomas H. CAFCAS, Jr., Counterdefendant.

No. 85 C 9898.

United States District Court, N.D. Illinois, E.D.

Nov. 4, 1988.

---

Ronald Rassin, Robbins, Rubinstein, Salomon & Greenblatt, Ltd., Chicago, Ill., for plaintiff.

Gerald G. Saltarelli, Ronald Butler, Butler, Rubin, Newcomer, Saltarelli & Boyd, Scott R. Lassar, Lawrence A. Wojcik, Nancy K. Baker, Karon, Morrison & Savikas, Chicago, Ill., for defendants.

## MEMORANDUM OPINION

BRIAN BARNETT DUFF, District Judge.

Ronald M. DeHaan, Paul J. Richter, and Kenneth L. Coughlan (known collectively as the "Individual Defendants") are the majority shareholders of DeHaan & Richter, P.C., a Chicago law firm and Illinois Professional Corporation. They have moved for summary judgment under Rule 56(b), Fed.R.Civ.P., against Thomas H. Cafcas, Jr., another DeHaan & Richter shareholder and former employee of the firm. They seek summary judgment on Counts 1 and 3 of Cafcas's Second Amended Complaint, while their firm seeks summary judgment on Count 3 only. Cafcas in turn has moved for summary judgment against the Individual Defendants on Count 1.

Because each side has moved for summary judgment, the court will first sketch the facts that are not in dispute. When the

court turns to each specific motion, it will add additional facts as the issues warrant, and will consider admitted facts only for purposes of particular motions. See Charles A. Wright, Arthur R. Miller, and Mary K. Kane, 10A Federal Practice and Procedure 2d § 2720 (1983).

Thomas Cafcas became a shareholder of DeHaan & Richter in 1982. On August 8, 1983, Cafcas sold some of his shares to Coughlan, and with Coughlan, DeHaan, and Richter, Cafcas entered into a Shareholders' Agreement. The Agreement provided for the purchase of shares by De-Haan & Richter in the event of a shareholder's death, incapacity, permanent impairment, termination through fault, and retirement. It also stated:

> 3.5 *Disposition Upon the Voluntary Withdrawal of Shareholder*—Should any Shareholder voluntarily leave his employment with Corporation, that withdrawing Shareholder shall be deemed to have offered to sell the shares of that Shareholder to Corporation for book value. Corporation shall purchase that withdrawing Shareholder's shares at not less than book value of those shares on the effective date of the withdrawal or termination date of the employment of the withdrawing Shareholder with payment to be made over a period not to exceed ten years and interest to be paid the withdrawing Shareholder on any outstanding balance at a rate not less than nine percent per year.

While they might not have forseen it when they signed the Agreement, Cafcas and the Individual Defendants had to consider the consequences of this provision nearly two years later. Amidst various disputes, Cafcas left DeHaan & Richter sometime in March of 1985 and accepted employment in California. He then sought to redeem his shares. The parties exchanged several letters throughout March detailing various plans whereby DeHaan & Richter would repurchase Cafcas's shares. The parties failed to agree on a price, however, and so Cafcas filed suit in this court.

*Count 1*

■ In Count 1 of his Second Amended Complaint, Cafcas asked this court to declare that the Shareholders' Agreement fails to cover a situation where a group of shareholders forces another shareholder to withdraw. Cafcas submits that the Individual Defendants pressured him to leave by reducing his salary, denying him access to financial information, holding meetings to which he was not invited, depriving him of mail, and preventing him from recovering personal property from his former office. The Individual Defendants insist, on the other hand, that ¶ 3.5 squarely covers this situation.

This court agrees with the Individual Defendants. Cafcas has presented no facts that would indicate that he and the Individual Defendants intended otherwise when they agreed to ¶ 3.5. Given the context of the paragraph in the Agreement—which seems to provide for every other reasonable contingency—this court construes the word "voluntarily" in ¶ 3.5 to mean by the operation of one's free choice. Cafcas has offered no evidence that the other shareholders overcame his free will, and so ¶ 3.5 covers this situation.

■ The Individual Defendants next contend that ¶ 3.5 obligates only DeHaan & Richter, and not themselves, to repurchase Cafcas's shares. That much is clear from the language of ¶ 3.5. Cafcas contends that this court should read "Corporation" in ¶ 3.5 to include the Individual Defendants, and he points to several portions of the Agreement that indicate that it was an agreement among individuals. From this Cafcas submits that every obligation described in the Agreement was a joint and several one.

While this court accepts that it was individuals who negotiated, drafted, and signed the Agreement, it would be contrary to the most fundamental principles of the law of contracts to disregard the plain language of ¶ 3.5 when interpreting it. That language states only that the Corporation has the duty to repurchase the shares of withdrawing shareholders. From the Agreement's first sentence it is clear that the

parties intended "Corporation" to have a discreet meaning: "This Agreement is entered into on the 8th day of August, 1983 between Ronald M. DeHaan ..., Paul J. Richter ..., Thomas H. Cafcas, Jr. ..., Kenneth L. Coughlan ... (Shareholders), and DeHaan & Richter, P.C., an Illinois Professional Corporation (Corporation)." Cafcas and the Individual Defendants are the "Shareholders" for purposes of the Agreement; DeHaan & Richter is the "Corporation." The parties intended this, and the court will not disturb that intention.

■ Cafcas argues that even if DeHaan & Richter is the sole party obligated to repurchase his shares under the Agreement, the firm has breached that obligation, and for that reason the Individual Defendants must repurchase his shares. Cafcas has not presented any Illinois decisions which state this rule, but he does present two theories that would produce the effect he desires. Cafcas submits first that DeHaan & Richter has been the alter ego of the Individual Defendants since his departure from the firm. As the court held in *McCracken v. Olson Cos.*, 149 Ill.App.3d 104, 109–10, 102 Ill.Dec. 594, 597–98, 500 N.E.2d 487, 490–91 (1986) (citations omitted), it is proper for a court to disregard the corporate "alter ego" and hold shareholders personally liable when there is

> such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist; and ... circumstances [are] such that an adherence to the fiction of a separate corporate existence would promote injustice or inequitable consequences. In determining whether to disregard a corporate entity, the court will ... look to a number of variables such as inadequate capitalization, failure to observe corporate formalities, the commingling of funds, and the absence of corporate records. Where such variables are coupled with some element of injustice or fundamental unfairness, the corporation will be considered as an aggregate of persons both in equity and at law and its officers, directors and shareholders will be held individually liable for the corporation's debts and obligations.

■ This court will not disregard DeHaan & Richter's corporate status in this case. Nowhere has Cafcas alleged that DeHaan & Richter is inadequately capitalized, does not observe corporate formalities, allows its shareholders to commingle their funds with those of the firm, or fails to keep proper records. The formation of a hostile majority voting bloc is insufficient to cause a corporation's shareholders to become individually liable for the corporation's obligations.

Cafcas's second argument as to why the Individual Defendants are liable is that they induced DeHaan & Richter to breach ¶ 3.5. Under Illinois law, a person is liable for tortious interference with a contract when a valid contract exists, the person knows of the contract, the person intentionally induces one of the parties to the contract to breach it, and damage results. Additionally, the injured party must plead and prove that the person who induced the breach lacked justification for his action. See *Venturini v. Affatato*, 84 Ill.App.3d 547, 553–54, 40 Ill.Dec. 1, 6, 405 N.E.2d 1093, 1098 (1980). Liability can extend to corporate officers and shareholders who, without proper business purpose and good faith, induce their corporation to breach a contract. See *Swager v. Couri*, 77 Ill.2d 173, 188–90, 32 Ill.Dec. 540, 545–47, 395 N.E.2d 921, 926–28 (1979).

The problem with Cafcas's use of this tort theory is that he has employed it pretty much as an afterthought. One cannot find the words "tort," "induce," or "interfere" anywhere in Count 1, and Cafcas devotes only a single paragraph to the subject in his Brief in Opposition to the Individual Defendants' Motion for Summary Judgment. Moreover, as noted above, Illinois law requires a plaintiff to plead that the person who induced the breach of contract lacked justification for his action, and Cafcas has not done this. This court will not allow Cafcas to amend his complaint by means of a motion for summary judgment, no matter how valid his theory may be.

Despite his defeats on the issues of the Individual Defendants' liability for pur-

chase of his shares pursuant to the Shareholders' Agreement or under Illinois tort law, Cafcas makes one additional demand of the Individual Defendants in Count 1 which they cannot evade through their motion for summary judgment. Among the various remedies he seeks in Count 1, Cafcas demands an accounting from the Individual Defendants. The Individual Defendants suggest that this demand stemmed from Cafcas's erroneous view of the obligations created under the Shareholders' Agreement, but Cafcas submits that his demand rests on rights that exist apart from those created by the Agreement. Illinois recognizes an action for an accounting, and so this court must treat Cafcas demand as it stands.

In order to obtain an accounting from the Illinois courts of equity, a person "must allege the absence of an adequate remedy at law and one of the following: (1) a breach of a fiduciary relationship between the parties; (2) a need for discovery; (3) fraud; or (4) the existence of mutual accounts which are of a complex nature." *People ex rel. Hartigan v. Candy Club,* 149 Ill.App.3d 498, 500–01, 103 Ill.Dec. 167, 169, 501 N.E.2d 188, 190 (1986). The Individual Defendants point out that Cafcas has not shown that he cannot obtain an adequate legal remedy, and thus they submit that this court cannot grant him an accounting. The court in *Candy Club* noted, however, that a person need not demonstrate the inadequacy of legal remedies when the person seeks an accounting on the basis of a breach of fiduciary duty. See *id.* at 501, 103 Ill.Dec. 167, 501 N.E.2d 188.

This raises the question of whether under Illinois law the majority shareholders of a professional corporation owe a fiduciary duty to a minority shareholder. Prior to 1983, Illinois law was unsettled on the issue. The Illinois courts had determined in numerous cases that a single controlling shareholder owed a fiduciary duty to other shareholders in the corporation, see, for example, *Shlensky v. South Parkway Bldg. Corp.,* 19 Ill.2d 268, 166 N.E.2d 793 (1960); *Ill. Rockford Corp. v. Kulp,* 41 Ill.2d 215, 242 N.E.2d 228 (1968); *Johnson*

*v. Central Standard Life Ins. Co.,* 102 Ill.App.2d 15, 243 N.E.2d 376 (1968); *Zokoych v. Spalding,* 36 Ill.App.3d 654, 344 N.E.2d 805 (1976); *Graham v. Mimms,* 111 Ill.App.3d 751, 67 Ill.Dec. 313, 444 N.E.2d 549 (1982), but none had determined that two or more shareholders who constituted a majority owed a similar duty to the minority.

An Illinois court took the controlling shareholder cases one step further in *Jaffe Commercial Finance Co. v. Harris,* 119 Ill.App.3d 136, 74 Ill.Dec. 722, 456 N.E.2d 224 (1983). In *Jaffe,* three individuals, Joel Salk and Paul and Ruben Harris, formed a loan and mortgage corporation. Each became an officer of the corporation and held an equal number of its shares. A dispute later erupted among the three over the acquisition of a bank, and the Harris brothers ousted Salk as a consultant to and officer/director of the corporation. Salk sued to liquidate the corporation or, alternatively, get himself reinstated to his corporate positions. Salk claimed he had a right to relief because the Harris brothers had violated their fiduciary duties toward him as directors and majority shareholders.

While ultimately disagreeing with Salk that the facts of the case indicated a breach of fiduciary duty, the *Jaffe* court unmistakably extended the fiduciary duties formerly imposed solely on single controlling shareholders to a group of shareholders who constituted a majority. While the court could have framed the issue in terms of the Harris brothers' obligations to the corporation's shareholders as officers or directors of the corporation, the court put the issue in terms of the brothers' voting control:

The law is uncontroverted that the individuals who control corporations owe fiduciary duties to their corporation and its shareholders. The decision of joint adventurers to form and operate as a corporation, rather than as a partnership, does not change the fact that they embarked on a joint enterprise; thus, their mutual duties and obligations are similar to those of partners. These duties involve exercising the highest degree of honesty and good faith in the dealings

and in the handling of business assets, thereby prohibiting enhancement of personal interests at the expense of corporate interests.

*Id.* at 143, 74 Ill.Dec. 722, 456 N.E.2d 224 (citations omitted).

This court hesitates to stretch *Jaffe*'s notion of controlling shareholder duties too far. As the *Jaffe* court itself noted, a shareholder is entitled to participate in the management of a corporation only according to the amount of his stock. That a group of shareholders is able to form a controlling bloc in a corporation is no indication that this same group is acting oppressively. *Id.* at 146, 74 Ill.Dec. 722, 456 N.E.2d 224. More importantly, this court questions whether the Illinois Supreme Court would impose the fiduciary duties suggested in *Jaffe* on a controlling group of shareholders in a corporation the size of, for example, General Motors. As the excerpt from *Jaffe* indicates, fiduciary relationships arise more often in entities that resemble partnerships in their formation, organization, and government. This is particularly true for Illinois close corporations. See generally Richard M. Guerard, Minority Shareholder Rights in Illinois Close Corporations, 72 Ill.Bar J. 528 (1984).

■ This court's reservations about *Jaffe* have little effect upon this case. The sole question here is whether Cafcas can assert a breach of fiduciary duty that will free him from having to demonstrate the absence of an adequate remedy at law to obtain an accounting. This court concludes that in certain cases—particularly those involving close corporations that have the characteristics of a partnership—majority shareholders owe fiduciary duties to minority shareholders. This duty includes good faith and utmost honesty in dealings affecting the affairs of the corporation. De Haan & Richter possesses these characteristics, and so this court concludes that the Individual Defendants owe fiduciary duties to Cafcas.

■ This does not end the matter, however. There are genuine issues of fact as to whether the Individual Defendants have breached their duties, and so Cafcas is not entitled to summary judgment on his demand for an accounting.

### Count 3

The Shareholders' Agreement does not preclude other methods of solving disputes like the one among Cafcas, DeHaan & Richter, and the Individual Defendants. The parties attempted to resolve their dispute without the aid of the courts or specific recourse to ¶ 3.5 in March 1985. Cafcas claims that the parties reached a settlement, but he says that the defendants later broke their promise. This forms the basis of Count 3 of Cafcas's Second Amended Complaint, a claim for breach of contract.

Cafcas submits that a contract concerning the purchase of his shares arose from the following events, events that the defendants accept as true for purposes of their motion for summary judgment: On March 16, 1985, Ronald DeHaan spoke with Cafcas and presented three alternatives for the purchase of Cafcas's shares. See Cafcas Rule 12(e) Statement, Exhibits E–G. The parties refer to these alternatives as Alternatives I, II, and III. On March 19, Cafcas addressed a letter to DeHaan as president of DeHaan & Richter that stated that he had accepted Alternative II. Cafcas described Alternative II as a plan whereby DeHaan & Richter would purchase Cafcas's shares, totalling 21.25% of the firm. DeHaan & Richter was to make payment based on the financial statement of December 31, 1984, with closing to occur on April 1, 1985. Cafcas presented a payment schedule that used $161,541 as a "Present Value" figure from which DeHaan & Richter would amortize its purchase liability to Cafcas. The interest rate on the payments was 13.21%. Final payment under Alternative II was due November 1, 1986. See *id.*, Exhibit D.

DeHaan received Cafcas's letter on March 21, 1985. On March 22, DeHaan replied to Cafcas, calling his letter a "counter-proposal" and rejecting it. In the fourth paragraph of his letter, DeHaan wrote:

Ken, Paul and I managed to spend a portion of March 8, 1985 devoted to

working on your withdrawal matters based on my statement to Ken and Paul that you and I had agreed upon the approximate range of your pro rata share of the book value of this corporation.... I called you on March 16 and during the course of our telephone conversation, I indicated to you that we had three possible proposals, each of which was based upon our understanding that your pro rata share of book value would be somewhere in the range of $160,000.00 but that we would ... review our work in process and we would attempt to resolve our fee arrangement with Al Kaplan pertinent to the Cole Taylor Financial Group matters.... I indicated to you that I did not believe that there would be a dramatic change in the range of your pro rata share of book value. You were aware that the Corporation's accountant was in the conference room with us and you raised no questions as to the statement of your pro rata share of book value being in the range of $160,000.00. The only question you asked of the ... accountant was regarding the present value of that book value which you suggested was contained on Schedules that the ... accountant could easily ascertain. I indicated that it was our impression that present value would be somewhere in the range of $100,00.00 to $108,000.00.

DeHaan then stated that Cafcas's calculations in his March 19 letter as to the book value of DeHaan & Richter "substantially differ[ed]" from what DeHaan and Cafcas had discussed. DeHaan also pointed out that they had never discussed (as Cafcas had provided in his letter) DeHaan & Richter's assumption of some of Cafcas's debts, interest rates, Cafcas's taking furniture from DeHaan & Richter's offices, the release of Cafcas's guaranty of DeHaan & Richter's debts owed to Michigan Avenue National Bank, or indemnity in lieu of the release of the guaranty. *Id.*, Exhibit E.

More letters followed. On April 3, 1985, DeHaan wrote to Cafcas's lawyer, Ronald Rassin, enclosing a copy of his March 21 letter and reiterating that Cafcas's calculations as to the book value of DeHaan & Richter were "not even close" to what he had discussed with Cafcas on March 16. *Id.*, Exhibit F. Kenneth Coughlan wrote another letter to Rassin on April 19, 1985, describing DeHaan & Richter's understanding of Alternative II and calling Cafcas's calculations as to the book value of the firm "unacceptable." Coughlan then presented three new alternatives. *Id.*, Exhibit G.

This court is now ready to turn to the defendants' motions on Count 3. The Individual Defendants seek summary judgment against Cafcas on Count 3 because the purchase contract, if any, obligated only DeHaan & Richter to purchase Cafcas's shares. That much is clear from Cafcas's March 19 letter. Cafcas reiterates the same arguments made above respecting the individual or personal nature of the obligations flowing from the Shareholders' Agreement, but this court finds these arguments unpersuasive. The March 19 letter, penned by Cafcas himself, states that DeHaan & Richter alone will purchase his shares. As a lawyer, Cafcas should have understood what these words mean, at least to a court.

■ Next is DeHaan & Richter's motion for summary judgment. The firm contends that it never signed Cafcas's March 19 letter, and since it and Cafcas could not perform under Alternative II within one year, the alleged contract is void under the Illinois statute of frauds. That statute provides, in part:

> No action shall be brought ... upon any agreement that is not to be performed within the space of one year from the making thereof, unless the promise or agreement upon which such action shall be brought, or some memorandum or note thereof, shall be in writing, and signed by the party to be charged therewith....

Ill.Rev.Stat. ch. 59, ¶ 1 (1983). DeHaan & Richter contend further that the contract is void under the statute of frauds of the Illinois Commercial Code relating to contracts for the sale of securities. See *id.* at

ch. 26, ¶ 8–319.*

This issue turns on what constitutes a sufficient writing under Illinois law. Cafcas admits that DeHaan & Richter never signed his March 19 letter, but he points to references to Alternative II in the other letters. He suggests that these references acknowledge that DeHaan & Richter offered three alternatives—one of which he accepted—and that these references bind DeHaan & Richter to its offer.

Under Illinois law, a contract can survive the proscriptions of the statute of frauds if a writing or a series of writings establishes the intention of the parties to enter into a contract. See *Yorkville Nat'l Bk. v. Schaefer*, 71 Ill.App.3d 137, 140, 27 Ill.Dec. 263, 266, 388 N.E.2d 1312, 1315 (1979). As the court in *Mid–Town Petroleum, Inc. v. Dine*, 72 Ill.App.3d 296, 303–04, 28 Ill.Dec. 261, 267, 390 N.E.2d 428, 434 (1979) (citations omitted), elaborated:

> The contract need not be on a single piece of paper, but the writings taken together must contain all the essential elements to show a contract between the parties so that there is no need of parol proof of any of the terms or conditions of the sale or the intention of the parties. It is necessary that where various writings are involved, they be connected in some definite manner. The signed writing or writings must refer expressly to the other writing, or the several writings must be so connected, either physically or otherwise, as to show by internal evidence that they relate to the same contract.

See also *Daehler v. Oggoian*, 72 Ill.App.3d 360, 366, 28 Ill.Dec. 250, 390 N.E.2d 417 (1979).

It is for this court to determine whether the four letters presented in Exhibits D–G of Cafcas's Rule 12(e) Statement contain the essential elements of a contract. The essential elements of a contract under Illinois law are the parties to the contract, the subject matter of the contract, and the price. Other terms may be left open to negotiation, as long as they are not material to the subject of the contract. See, for example, *Morey v. Hoffman*, 12 Ill.2d 125, 130–31, 145 N.E.2d 644, 647–48 (1957) (possession, inventory, interim management, disposition of interim profits essential to contract for sale of hotel; these matters unresolved, so no sufficient written contract).

This court can determine the parties and the subject matter of the purported contract quite easily: the parties are DeHaan & Richter and Cafcas, and the subject matter is DeHaan & Richter's purchase of Cafcas's shares. This court cannot find a definite price term, however. As Cafcas's March 19 letter indicates, Alternative II involved two crucial valuations: the book value of the firm as of December 31, 1984, and something called "Present Value." *Id.*, Exhibit D. While the book value of an entity is a fairly objective figure—one that a court could ascertain without too much difficulty—something called "Present Value" is not. In order to ascertain what most people call a "present value," the court would have to know the amount to be amortized, the stream of payments, and a discount rate. Cafcas took these factors, whatever they were, and came up with a "Present Value" of $161,541. DeHaan took these figures, however, and came up with a range of $100,000 to $108,000.

There could be any number of reasons why these figures differ. Cafcas's "Present Value" looks remarkably close to the figure DeHaan employed as the book value of Cafcas's shareholder interest, and so Cafcas may have assumed that when DeHaan used the term "present value" in their meeting of March 16 (if DeHaan even used the term), DeHaan meant the book

---

* For purposes of DeHaan & Richter's motion, this court will assume, as both parties have, that both of these statutes apply to this case and that they have the same effect. There are at least two reasons, however, why others might not wish to make the same suppositions. First, it could be argued that ¶ 8–319 does not cover contracts for sales of shares of Illinois Professional Corporations. They are not freely marketable, and are often subject to agreements such as those involved in this case. Second, since different concerns may have prompted the passage of each of these statutes, qualities that would satisfy the writing requirement of one statute might not meet the requirements of the other.

value of Cafcas's shares at the present time. DeHaan & Richter may have used the term in the sense those in finance do: that value reached when one discounts a stream of payments or a single future payment to the present. Regardless of who intended what, however, it is clear that there was no written contract here. In fact, there may have been no contract at all.

In summary, this court enters summary judgment in favor of Ronald M. DeHaan, Paul J. Richter, and Kenneth L. Coughlan on the issue of whether they are liable to Thomas H. Cafcas, Jr. under the Shareholders' Agreement. This court denies De-Haan, Richter, and Coughlan's motion for summary judgment in their favor on Cafcas's request for an accounting. This court enters summary judgment in favor of all defendants on Cafcas's Count 3, and denies Cafcas's motion for summary judgment on his Count 1.