(No. 20807.—

THE LOEWENTHAL SECURITIES COMPANY, Defendant in Error, *vs.* THE WHITE PAVING COMPANY *et al.* Plaintiffs in Error.

*Opinion filed December 23, 1932—Rehearing denied Feb. 22, 1933.*

GEORGE F. BARRETT, CHARLES V. BARRETT, WILLIAM C. WERMUTH, and COOKE, SULLIVAN & RICKS, (SCHUYLER, DUNBAR & WEINFELD, GEORGE A. COOKE, EDWARD H. FIEDLER, and PHILIP A. GIBBONS, of counsel,) for plaintiffs in error.

MAYER, MEYER, AUSTRIAN & PLATT, (FREDERIC BURNHAM, and RICHARD MAYER, of counsel,) for defendant in error.

Per CURIAM: Defendant in error, the Loewenthal Securities Company, filed its bill in the superior court of Cook county against the plaintiffs in error, the White Paving Company and the White Construction Company, and also against the Bessemer Investment Company and the city of Chicago, as defendants. The two last named defendants were dismissed from the case. The trial court entered a decree requiring the paving company and the construction company to pay to the securities company the sum of $210,458.76 as damages, with interest thereon at the rate of five per cent. The decree was affirmed by the Appellate Court, and this court awarded a writ of *certiorari* for a review of the record.

At the times in question the complainant securities company was a corporation engaged in the business of buying and selling municipal securities, including local improvement bonds. The construction company was a Wisconsin corporation organized in 1908 and the paving company was an Illinois corporation organized in 1915. Michael E. White and his relatives owned all but a few shares of the stock of the construction company and the paving company, but neither of these corporations owned any of the

stock of the other nor were the stockholders of the two corporations identical. The construction company was engaged in construction work and had various jobs throughout the country, including work in the suburbs of Chicago. Although its work was principally the construction of roads, it also did other construction work and had a contract for construction of a sewage disposal plant at the DesPlaines river, near Chicago. The paving company was engaged in paving streets in Chicago. It had never done, and was not equipped for, any other kind of work. Its work had been confined to asphalt paving. White was an officer of both companies and the companies had other common officers. Each of these companies kept its own set of books and had its own bank account. They were operated as separate and distinct corporations, although occasionally one would lend some of its employees or equipment to the other and make a charge for the lending. Each of these companies had its own equipment, its own field organization and its own jobs.

The securities company and its officers knew White and knew of the existence of both the construction company and the paving company. It also knew of the character of the business done by these companies. The securities company had made contracts with the paving company as early as the years 1917 and 1918 for the purchase of vouchers received by the paving company from the city of Chicago on paving jobs in the city. In 1921 the securities company solicited another contract with the paving company and a separate contract with the construction company. At that time the securities company stated that it would not make a contract with the construction company unless it could also make one with the paving company. Finally a contract dated September 20, 1921, was made between the securities company and the paving company. The securities company made no contract with the construction company but invited the construction company to submit its paper from time to time in the future, and stated that if

such paper met the requirements of the securities company the latter would buy it or make a contract to buy it. No representation or promise was made at any time that the paving company would bid for any city jobs or that White or the construction company would not so bid.

The contract of September 20, 1921, between the securities company and the paving company, provided a price of ninety cents on the dollar for the bonds and vouchers to be sold by the paving company to the securities company thereunder. At the instance of the paving company that contract was canceled May 23, 1922, and on that date a new contract was entered into between the same parties, which is the contract now in question. No contract was made with the construction company or with Michael E. White. By the contract of May 23, 1922, the paving company agreed to sell the securities company the bonds and vouchers "that have been issued by the city of Chicago in payment of work done or to be done" by the paving company "on contracts awarded" to the latter by the city during the years 1921 and 1922, with the exception of $300,000 of such bonds or vouchers which the paving company desired to dispose of or retain for itself. The price of these securities was to be ninety-two cents on the dollar for five per cent bonds or vouchers and ninety-five cents for six per cent securities. It was agreed, however, that should the market price paid by the securities company to any other contractors for the 1922 season be in excess of the above prices the paving company was to receive the benefit of such higher price. The contract contained provisions making the purchase of the securities subject to obtaining the approval of specified firms of attorneys and subject to obtaining "final adjudication" of the court in the special assessment proceedings. The clause with respect to final adjudication is as follows: "It is further understood that on any of the bonds or vouchers delivered wherein work is completed prior to February 15, 1923, unless final

adjudication is entered into on or before March 1, 1923, we will re-purchase from you any vouchers (or bonds that may have been issued in exchange for vouchers) on demand at the price that you paid us for said bonds or vouchers, plus interest, at the rate said bonds or vouchers bear, from date of issue to date of re-purchase. On any work completed after February 15, 1923, unless final adjudication is had on said work before March 1, 1924, we will re-purchase from you any vouchers (or bonds that may have been issued in exchange for vouchers) on demand at the price that you paid us for said bonds or vouchers, plus interest, at the rate said bonds or vouchers bear, from date of issue to date of re-purchase." This was followed by a clause by which the paving company also agreed to sell, and the securities company agreed to purchase, "the interest-bearing vouchers that may be issued against supplemental assessments" in cases where the paving company had theretofore sold and delivered to the securities company "the original paper," and the securities company agreed to "receive and purchase" the supplemental paper "upon the same terms and conditions that the original paper was purchased, as soon as final adjudication has been entered by the court and legal opinions furnished" by one of the specified firms of attorneys, and the paving company agreed to re-purchase such supplemental paper from the securities company "on the same terms and conditions as apply to re-purchase of paper on the original warrants."

On April 29, 1922, a special assessment for the so-called Broadway sewer project in the city of Chicago was confirmed. The city advertised for bids for this work three times but was unable to obtain any bidders. About September 12, 1922, the city again advertised for bids, to be opened September 27, 1922. At the suggestion of Michael E. White, Herlihy, who was an officer of the paving company, approached Freudenthal, who was an officer of the securities company, and sought to induce him to ex-

clude the Broadway sewer project from the operation of the contract. Herlihy stated, in effect, that unless that job was so excluded the paving company would not submit a bid but that the construction company would. Freudenthal refused to accede to this request. The paving company did not submit a bid for that work. There were only two bidders: the construction company, whose bid amounted to $2,386,560, and the American Sewer and Drain Construction Company, which bid $2,421,280, or about $35,000 ·more than the bid of the construction company. The city awarded the work to the construction company and these two parties entered into the contract of October 28, 1922. The construction company sub-let all the work to others but supervised the doing of the work through its own engineering force. Construction of the sewer constituted the principal part of the work, and this was sub-let to the American Sewer and Drain Construction Company and Michael Pontarelli, as sub-contractors. Construction of sidewalks and driveways and most of the curb and gutter work was sub-let to the Simpson Construction Company. The remainder of the work, which was of minor importance and merely incidental to the main work, consisting of repairing the surface of the streets and a portion of the curb and gutter work, was sub-let by the construction company to the paving company. The construction company made all payments to its sub-contractors out of its own funds and also paid out of its own funds all other expenses in connection with the city contract. The paving company's men did the work for the paving company ·under its sub-contract but did no other work. The evidence shows that with respect to the sub-contract between the construction company and the paving company the two companies dealt with each other on the basis of their separate rights and interests and kept separate accounts in that respect.

Because of objections to the special assessment made by property owners under the statute the work on the Broad-

way sewer project was not commenced until November, 1926—more than three years after the city contract had been let to the construction company. The first vouchers of the city for this work were issued in January, 1927. On September 11, 1926, the construction company made a written contract with the South Shore Investment Company, a corporation engaged in somewhat the same business as the securities company, by which the construction company agreed to sell and the South Shore company agreed to purchase all the five per cent bonds and vouchers to be issued by the city under the Broadway sewer contract at a price of ninety-seven and one-fourth cents on the dollar, plus the accrued interest, or five and one-fourth points higher than the price fixed in the contract between the securities company and the paving company.

On March 30, 1927, the securities company filed its bill of complaint against the paving company and the construction company. The Bessemer Investment Company and the city of Chicago were also named as defendants, the former on the theory that the construction company had sold or agreed to sell the bonds and vouchers to it, but these two defendants were subsequently dismissed as parties. The bill alleged, among other things, that when the paving company had sought to induce the securities company to exclude from its contract all bonds and vouchers with respect to the Broadway sewer job it threatened that unless this should be done the paving company would thereafter bid upon city work (and specifically the Broadway sewer project) in the name of the construction company instead of in its own name; that the securities company stated in response that if this project were let to the construction company the securities company would regard it as a subterfuge and would hold the paving company liable for all resulting damages it might sustain. It alleged that pursuant to that scheme, and for the purpose of evading its contract with the securities

company, the paving company bid for that job under the name of the construction company. The bill also alleged that during the remainder of the year 1922 the paving company did not bid for any other city work in its own name, but under the name of the construction company bid for, and obtained from the city, contracts for other special improvements, and that during the time the contract of May 23, 1922, was in effect the vouchers issued by the city on such improvements were sold to the securities company in the same manner as though they had been issued to the paving company, and that immediately upon the expiration of the year 1922 the paving company again began to bid for special assessment work in its own name. The relief prayed by the bill was that the contract between the city and the construction company should be decreed to be a contract between the paving company and the city; that the paving company be "required to specifically perform its contract" with the securities company and to deliver to the securities company all the bonds and vouchers which might be thereafter issued by the city to either the paving company or the construction company for work done under the Broadway sewer contract, and that the paving company and the construction company be required to account to the securities company for all profits of which they had deprived the securities company by the wrongful conversion and sale of the bonds and vouchers already issued by the city. The bill also prayed for an injunction to restrain the two defendants from selling or disposing of any of the bonds or vouchers pending a disposition of the case, but no temporary injunction was ever applied for or issued. Pending the suit the construction company delivered to the Bessemer Investment Company from time to time the bonds or vouchers issued by the city, in accordance with the contract between the two companies made in September, 1926. At the time of the decree all the city bonds and vouchers had not been issued.

The trial court entered a lengthy decree finding the issues for complainant and finding that complainant was entitled to specific performance as prayed in the bill, but in view of the fact that the construction company had disposed of the bonds and vouchers the trial court awarded damages to complainant and against the two defendants in the sum of $210,458.76 and interest from the date of the decree. The amount of the damages was the difference between the total amount of the bonds and vouchers taken at the face value of 100 and the price of ninety-two specified in the contract between the paving company and the securities company.

The paving company and the construction company assert that the decree cannot be sustained for several reasons. They argue that the paving company was under no obligation to submit a bid for the Broadway sewer job; that it did not bid and did not make the contract with the city; that it did not directly or indirectly receive any of the bonds or vouchers, and that therefore it did not violate its contract with the securities company; that the construction company bid for and entered into the city contract on its own behalf; that it had no contract with the securities company, and therefore could not be required to deliver any bonds or vouchers to the securities company or to pay damages for its refusal to do so. They also contend that even if it could be held that the city contract is to be considered to be the contract of the paving company and not of the construction company, the securities company would not have been entitled to any of the bonds or vouchers; that if the securities company had a cause of action it was at law and not in equity, and that in any event the securities company is barred by *laches*.

The securities company contends, in support of the decree, that the city contract is to be considered in equity as having been made by the paving company. It also contends that the paving company and the construction company by

their officers, and particularly Michael E. White, entered into a conspiracy to enrich themselves at the expense of the securities company by having the construction company bid instead of the paving company and thus permit the latter to "evade" its contract with the securities company; that White controlled both companies and that they were merely his agencies, and therefore the result of the alleged conspiracy was to afford him a larger profit than he would have had if the city contract had been made by the paving company instead of the construction company.

The complainant contends, and the Appellate Court held, that a court of equity can in this case disregard the legal fiction of the separate corporate entities of the paving company and the construction company and find that the two companies were really Michael E. White because of his ownership of a controlling interest in both companies, and that therefore whatever White or the construction company did was in the eyes of the law the same as if it had been done by the paving company. We are unable to agree with that contention. As previously stated, the complainant knew of the existence of both of these companies and the fact that they were controlled by White. It had carried on negotiations with both companies for the purpose of making separate contracts with each of them. After first seeking to make a contract with both companies it chose to make such contract only with the paving company. That contract bound the paving company alone. It did not and could not bind either White or the construction company or any other person. (*Wollenberger* v. *Hoover*, 346 Ill. 511; *Hall Safe Co.* v. *Herring-Hall-Marvin Safe Co.* 146 Fed. 37, (C. C. A.); *Donnell* v. *Herring-Hall-Marvin Safe Co.* 208 U. S. 267; 14 Corpus Juris, 55, 56.) The contract did not require the paving company to bid for or to make any contract with the city. It was only in the event that the paving company entered into such a contract with the city and obtained bonds or vouchers under it that the paving

company was obligated by the contract to deliver them to the complainant under their contract. Since the paving company did not make the city contract and did not receive any city bonds or vouchers the contract has no application.

The individual, White, was not a party to the contract between the paving company and the complainant and was not in any sense bound by it. Notwithstanding that contract he was free to bid for and obtain the city contract in his individual capacity. Had he done so, the complainant would have had no cause of action against him or anyone else under its contract with the paving company. The construction company was not bound by the contract of the paving company. The construction company was free to bid for the city contract on its own behalf and was not bound in any way to deliver the resulting bonds or vouchers to the complainant. The construction company was not a subsidiary of the paving company. Neither of these companies controlled or held any stock in the other. The complainant in its brief admits that neither of these two companies was "the dummy or *alter ego* of the other." In bidding for and in entering into the city contract the construction company acted strictly within its rights. When it obtained the city bonds and vouchers it was not obligated to deliver them to the complainant but was free to dispose of them in any way it saw fit. In *Donnell* v. *Herring-Hall-Marvin Safe Co. supra,* the Supreme Court of the United States in an opinion by Mr. Justice Holmes said: "Philosophy may have gained by the attempts in recent years to look through the fiction to the fact and to generalize corporations, partnerships and other groups into a single conception. But to generalize is to omit, and in this instance to omit one characteristic of the complete corporation, as called into being under modern statutes, that is most important in business and law. A leading purpose of such statutes and of those who act under them is to interpose a non-conductor; through which, in matters of

contract, it is impossible to see the men behind. However it might be with a partnership, (*Russia Cement Co.* v. *LePage,* 147 Mass. 206, 211, 9 Am. St. Rep. 685, 17 N. E. 304,) when this corporation sold its rights everybody had notice, and knew, in fact, that it was not selling the rights personal to its members, even if, as always, they really received the consideration, or, as usual, they all assented to its act. That it contracted for such assent, if it did, by its undertaking to dissolve, does not make the contract theirs." It is impossible, therefore, to disregard the corporate entities of the two corporations and to hold that in theory of law the contract of the one is to be considered the contract of the other by reason of the fact that White controlled both corporations.

It would be equally improper, in view of the evidence in this record, to hold that as a matter of fact the paving company, rather than the construction company, actually made the bid and entered into the city contract for construction of the Broadway sewer. There is no evidence that the city contract was made by the construction company for or on behalf of the paving company. On the contrary, the record shows that the construction company made the contract for itself, as principal. It undertook the responsibility for construction of the project and all the liabilities in connection with the work, and it received the vouchers and bonds, sold them and kept the proceeds for itself. It did not pay any of the proceeds to the paving company and did not account to the latter for the profits. Although the construction company sub-let all the work to others it supervised the work. A very minor portion of the work, consisting of repairing the surface of the streets, was sub-let to the paving company, but in this respect the two companies dealt with each other on the basis of their separate rights and interests and kept separate accounts.

The witness Herlihy, who had been an officer of the paving company and general manager of the construction

company, testified that before the bidding he had interviewed Freudenthal, one of the officers of the securities company, and at White's direction had stated that unless the vouchers from the Broadway sewer job were excluded from the paving company's contract "we will bid our work in future under the name of the White Construction Company." Herlihy also testified that after the construction company had entered into the contract with the city he told one of the complainant's officers that he had been instructed by White to say that "we did exactly what we said we were going to do—we bid the Broadway sewer job as the White Construction Company job." This does not establish that the construction company, in making the bid and entering into the city contract, was acting for and on behalf of the paving company, as agent or otherwise. It indicates, at most, that the officers of the two companies had decided that unless the paving company's contract with the complainant was modified they would have the construction company bid for the city work rather than the paving company. The complainant in its briefs in this court says: "Complainant does not contend that the construction company filed a bid for and made the city contract as agent for the paving company. * * * We have not sought to invoke the ordinary doctrines of agency. We have proceeded on a theory of conspiracy."

We come, therefore, to the basis principally relied upon by the complainant to sustain the decree.

It is argued that White and other officers of the paving company and the construction company entered into a conspiracy to "evade" the paving company's obligations under its contract with the complainant in order to deprive the complainant of the benefits of that contract and to enrich White and his two companies at the expense of the complainant. Under its contract with the complainant the paving company was not under any obligation to bid for or attempt to obtain the city contract. This is admitted by

the complainant. As we understand the argument, the complainant does not contend that the paving company was guilty of a breach of contract. It is contended, however, that White and the paving and construction companies conspired together to "evade" the paving company's contract with the complainant or to induce a breach of that contract "in the sense of cessation, termination, breaking off of a contractual relation which would have continued had it not been for the wrongful interference."

The complainant also argues that there was a "contractual relation" between the paving company and the complainant, and that "the construction company was liable because without just cause or excuse it intermeddled in the affairs of securities company and paving company and accomplished the termination or breaking off of contractual relations theretofore existing between paving company and securities company." The "contractual relation" thus said to have been interfered with was the expectation by the complainant that the paving company would continue to submit bids for city work. It is unnecessary for us to determine whether the relations between the paving company and the complainant under their contract were such as would give rise to a cause of action against one who should wrongfully induce the paving company not to bid for city contracts. There is no evidence that the paving company had ever submitted a bid for or entered into a city contract of this kind. Prior to the letting of the Broadway sewer job the paving company had usually submitted bids for paving work, and the proof is that its bids were limited to asphalt paving jobs of the city. It had never done any other kind of work. Specifically it had never bid for or obtained a sewer job of any kind. The complainant introduced this evidence: "There is a vast difference between a paving job and what you would call a construction job. * * * A paving job requires one kind of equipment and a construction job will require an entirely different kind. And the

same is true of the organization. Men are trained as pavers that couldn't handle construction work, and *vice versa.* They are two entirely different fields. A construction job such as the Broadway sewer would require men of a different kind of experience." Since the paving company had not made a practice of bidding for any but asphalt paving jobs it cannot be said that a contractual relation between it and the complainant was interfered with.

Aside from this, however, the evidence in this record cannot sustain the decree on the theory of a tort cause of action for damages. To support such a cause of action it is necessary to establish that an outsider has "maliciously" and "without lawful cause or justification" induced a breach of contract or an interference with or termination of a recognized contractual relation. This decree awards damages against both the paving and the construction company. The paving company was admittedly under no obligation to submit a bid for the city contract, and it could not, in any event, be held liable in damages for failing to do so. It was free to bid or not to bid, as it saw fit. Its failure to bid, for whatever reason, cannot give rise to a cause of action either for breach of contract or in tort. Its conduct in failing to bid cannot properly be termed even an evasion of its contract. There is no showing in this record that the construction company acted maliciously or with an improper motive in bidding for the city contract. It was free to bid, unhampered in any way by the paving company's contract with the complainant. As between the paving company and the construction company the latter was in a much more favorable position to compete for this work. It was not bound to sell its vouchers and bonds at the price of ninety-two cents on the dollar, as was the paving company. The paving company had agreed to sell its vouchers to the securities company at ninety-two cents on the dollar—a discount of eight per cent—which would necessarily have to be taken into consideration in determining whether the paving com-

pany could make a profit in doing the work. The construction company had no such contract and ultimately sold its vouchers from this work at ninety-seven and one-fourth cents on the dollar. The construction company's bid was $2,386,560, and on the basis of the respective prices for the vouchers this meant an advantage in the bidding in favor of the construction company, as against the paving company, of more than $125,000. For some reason the city had received no bids from any contractor in response to its first three advertisements. In response to the fourth advertisement only two bids were submitted—one by the construction company and the other by the American Sewer and Drain Construction Company—and the construction company's bid was only about $35,000 less than that of its competitor for this work. It therefore seems most probable that had the paving company submitted a bid for this work it would not have been the low bidder in view of the disadvantage it sustained, as against the construction company, in the price it would have received from the sale of the vouchers.

The evidence in this record is not sufficient to establish that the construction company was actuated by malice or that it acted without lawful cause or justification in submitting its bid for the city contract. White and the other officers of the two defendant corporations, who were responsible for the failure of the paving company to submit a bid and for inducing the construction company to bid, were not outsiders intermeddling maliciously in the contracts or affairs of other parties. They were privileged, as other corporate officers, to act for their corporations in accordance with their business judgment and discretion. They were not required, as officers of the paving company, to submit a bid on its behalf and did not commit a legal wrong in deciding that the construction company should bid. For these and other reasons the decree cannot be supported on the theory of a cause of action for conspiracy to induce a breach or termination of a contractual relation. The basis

for any such theory is necessarily that the paving company did not bid for and did not make the contract with the city. The complainant's bill negatives any such theory. It asserts that the paving company submitted the bid and made the city contract. It prayed that the construction company's contract with the city be reformed into a contract between the paving company and the city, and that after such reformation the paving company be decreed to specifically perform its contract with the complainant.

As previously stated, the plaintiffs in error urge other points against the decree, but in the view we have taken of the case it is unnecessary to consider them.

The decree of the trial court and the judgment of the Appellate Court are in our judgment without foundation in the record and are therefore reversed.

*Decree and judgment reversed.*