**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**

December 18, 2009

Charles R. Fulbruge III
Clerk

No. 09-40164

MARATHON FINANCIAL INSURANCE, INC., RRG,

Plaintiff-Appellant

v.

FORD MOTOR CO., FORD MOTOR CREDIT CO., PRIMUS FINANCIAL
SERVICES, FORD EXTENDED SERVICE PLAN, FORD MOTOR SERVICE
COMPANY, AUTOMOBILE PROTECTION CORPORATION, AMERICAN
ROAD INSURANCE COMPANY,

Defendants-Appellees

Appeal from the United States District Court
for the Eastern District of Texas

Before HIGGINBOTHAM and STEWART, Circuit Judges, and ENGELHARDT,
District Judge.[*]

CARL E. STEWART, Circuit Judge:

Marathon Financial Insurance Company, Inc. ("Marathon") insures vehicle
service contracts sold by Automotive Professionals, Inc. ("API"), which were sold
at the dealerships of Ford Motor Company.[1] In 2004, Ford changed its policy and
would no longer finance purchases of vehicle service contracts unless the insurer

---

[*] District Judge, Eastern District of Louisiana, sitting by designation.

[1] For the sake of brevity, and because the distinctions are not relevant to the issues
before the Court, the defendants are collectively referred to as "Ford."

had a stability rating of A- or better. Marathon did not have an A- or better rating. Marathon filed suit against Ford, bringing claims of tortious interference with contract and tortious interference with prospective business relations. In March 2006 the district court dismissed the latter claim under Rule 12(b)(6). More than two years later, Marathon filed motions to amend to reassert tortious interference with prospective business relations and to reopen discovery. The motions were denied and the district court later granted summary judgment in favor of Ford. Marathon appeals on the grounds that, under Illinois law, the district court erred by placing the burden of proof on Marathon to show lack of justification for Ford's alleged tortious interference with contract, and by concluding that Ford's conduct was justified as a matter of law, and that the court abused its discretion by denying Marathon additional discovery and denying Marathon leave to file its Fifth Amended Complaint.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. The Vehicle Service Contract Business

Marathon is a Risk Retention Group ("RRG") insurer that insures payment for repairs on vehicle service contracts ("VSCs"), also known as extended service contracts. VSCs are contracts that cover the cost of repairs after the original manufacturer's warranty on a vehicle expires; Marathon provides coverage in the event that the contract's seller cannot meet its obligations. Marathon insured VSCs sold by API. API's VSCs, and Marathon's accompanying insurance, were sold at dealerships marketing various vehicle brands, including Ford's brands. Ford also sold insured VSCs, in competition with API and Marathon.

Ford finances transactions involving combined purchases of Ford-brand vehicles and VSCs, which could be from Ford, API, or other providers. These financing transactions do not take the form of a direct loan of cash to consumers. Rather, Ford purchases retail installment sales contracts from dealers. Once it

purchases the contract, Ford pays the dealer and then bears the risk of collecting the payments from the vehicle purchaser.

Before January 1, 2005, Ford regularly financed vehicle purchases that included the sale of a VSC if the VSC in question was backed by an insurance company with an A.M. Best rating of A- or better, or if the insurer of the contract was backed by a reinsurer with an A.M. Best rating of A- or better. A.M. Best is a recognized insurance rating agency, and its ratings are widely used to assess the financial strength and stability of insurance companies. Under that policy, Ford regularly financed vehicle purchases that included the sale of API VSCs insured by Marathon.

### B. Ford's Policy Change

Ford claims that events in 2003 forced it to reevaluate its financing standards. National Warranty Insurance Company ("NWIC"), another RRG that wrote insurance for third-party sellers of VSCs, filed for bankruptcy protection in the Cayman Islands. The NWIC bankruptcy left many consumers with essentially worthless VSCs. The bankruptcy impacted Ford and its dealers because consumers who had purchased NWIC-backed VSCs from Ford dealers looked to the dealers to satisfy the obligations of those contracts. Many dealers were concerned about the effect on their reputations, and chose to bear the cost of the repairs themselves, or sought assistance from Ford, in order to keep their customers happy. Ford effectively assumed responsibility for the liability on numerous NWIC-backed contracts.

NWIC, like many insurers, had been rated by A.M. Best. Although A.M. Best had downgraded NWIC's rating to a grade below A-, Ford had continued to finance transactions that included NWIC-backed VSCs because NWIC had reinsurance from an insurance carrier that had an A.M. Best rating of A- or better. When NWIC went bankrupt, however, the reinsurer did not cover NWIC's obligations on the VSCs it had insured. Instead, the reinsurance

obligations flowed only to NWIC, rather than to the consumers, meaning the vehicles would not be properly serviced and consumers would be left to make claims in bankruptcy court after NWIC filed for bankruptcy protection.

Ford determined that beginning January 1, 2005, it would no longer finance the purchase of VSCs unless the contracts were backed by an insurer with an A.M. Best rating of A- or better; the A.M. Best rating of a reinsurer would no longer be sufficient.

Marathon has no A.M. Best rating of any kind and has never had or sought such a rating. Marathon sought an exemption from the A- financial stability rating requirement. Marathon claimed to Ford that despite having no rating, the VSCs it backed for API were secure. Ford extended the operative date of the A- financial stability rating requirement to Marathon-backed VSCs, but Marathon could not obtain the rating within the allotted time. Although Marathon offered to provide Ford a letter of credit securing its obligations on the VSCs that it insured, it never obtained such a letter of credit. Ultimately, the A.M. Best A- rating was impossible for Marathon to obtain.

API found an insurer rated A- or better by A.M. Best and continued its business relationship with Ford.[2] Marathon lost other business as well; Marathon-backed VSCs could not be sold to other auto brands because dealerships found it too cumbersome to sell one VSC product to Ford and another to the other auto brands.

## C. Procedural History

Marathon filed this action on January 26, 2005, asserting several federal antitrust claims and other state-law counts. Marathon amended its complaint

---

[2] In 2007, API filed for bankruptcy protection in the United States Bankruptcy Court for the Northern District of Illinois. API ceased paying claims on its VSCs. On the API contracts that Marathon had insured, Marathon has made payments for consumer claims in only seven states. For those API contracts that it insured in other states, it has not made any payments to cover consumer claims.

on four occasions to eliminate the antitrust claims. Marathon ultimately alleged that Ford interfered with the Marathon-API contractual relationship by willfully and intentionally causing API to stop using Marathon as the insurer of its VSCs in order to increase the sales volume of Ford's competing products, and that Ford interfered with a prospective business relationship between Marathon and API. Marathon's primary contention was that Ford, having authorized the formation of competitive contracts which qualified for Ford financing, was not entitled to withdraw that authority on a blanket basis because of the obvious damage that such withdrawal would have on the business of the contracting parties. Marathon asserted that only if, on an individual basis, there was actual cause for denying approval, could withdrawal of existing approval be justified.

On March 28, 2006, the district court dismissed the tortious interference with prospective business relations claim on Ford's Motion to Dismiss under Rule 12(b)(6). The court later entered a scheduling order, setting the deadline for filing amended pleadings for September 3, 2006. On July 17, 2008, less than two months before the then-scheduled trial date and 22 months after expiration of the deadline for amending the pleadings, Marathon sought leave to amend its complaint for a fifth time. Marathon's proposed Fifth Amended Complaint sought to reassert the previously dismissed claim for tortious interference with prospective business relations. Contemporaneously filed with its Motion for Leave, Marathon also filed a Motion to Clarify, Modify, or to Set Aside In Part the Order of March 28, 2006, as well as a Motion for Continuance. The continuance motion requested time to conduct additional discovery, as the discovery cut-off passed on July 8, 2008. The district court heard oral argument on all of Marathon's motions on August 25, 2008, and later denied the Motion for Leave to File Fifth Amended Complaint and Motion for Continuance.

On August 8, 2008, Ford filed its Motion for Summary Judgment. Ford presented evidence that Marathon had in fact continued to write insurance on

API-issued VSCs until API ceased business operations in April 2007. Additionally, Ford presented evidence that Marathon's own agreements with API required API to obtain insurance coverages that would cover obligations to Marathon from carriers rated with an A.M. Best rating of A- or better. Marathon's Chief Executive Officer conceded that such requirements are "pretty much established in the industry." Marathon's expert also conceded that the business decision that Ford made was not "an unrealistic decision to make."

On December 12, 2008, Marathon filed another Motion for Continuance in order to conduct additional discovery. That motion sought specific discovery that Marathon conceded had been at issue in its July 17, 2008 Motion for Continuance.

On January 27, 2009, the court denied Marathon's latest Motion for Continuance and granted Ford's Motion for Summary Judgment. The court held that Marathon failed to show good cause as to why the allegedly necessary depositions could not have taken place during the four years of litigation. Further, in granting Ford's Motion for Summary Judgment, the district court determined that "regardless of whether Marathon or Ford bears the burden of proof on the issue of justification, Marathon has still failed to meet its summary judgment burden." The district court noted even if Marathon bears the burden of proof only when "privilege" is established by the complaint, Marathon's Fourth Amended Complaint established the issue of privilege. Alternatively, the district court held that even if Ford has the burden as an affirmative defense, it "has established such a defense" and Marathon has not rebutted it. The district court concluded that "Marathon has proffered no evidence whatsoever . . . to support the allegations . . . that Ford lacked justification or privilege for its conduct in implementing the A- Policy," and granted Ford's motion for summary judgment on Marathon's claims.

## DISCUSSION

### A. Burden of Proof to Show Lack of Justification

The allocation of the burden of proof is a legal issue reviewed *de novo*. *Grilletta v. Lexington Ins. Co.*, 558 F.3d 359, 364 (5th Cir. 2009).

Marathon asserts that the district court misapplied Illinois substantive law on the placement of the burden of proof for justification, and that the district court erred by requiring Marathon to come forward with summary judgment evidence to support the lack of justification. Marathon claims that the district court failed to assess the status of Illinois law to determine whether the law was clear or whether an *Erie* guess was necessary; instead, observing that the state law was "confusing," the court misapplied Illinois authorities. Additionally, Marathon avers that the district court incorrectly held that use of the word "privilege" in the complaint was enough to implicate the existence of a statutory or common law privilege.

Ford initially insists that—as the district court held—whether Marathon or Ford had the burden of proof, Marathon failed to demonstrate a genuine issue of material fact. Ford then contends that Marathon bears the burden of proving lack of justification under Illinois law for two reasons: Ford's actions were privileged, and Marathon specifically raised the issue of privilege in its pleadings, thereby conferring upon itself the burden of proving lack of justification.

As Illinois intermediate courts, the district court, and the parties all admit, there is "rampant confusion in this area of the law." *Roy v. Coyne*, 630 N.E.2d 1024, 1030 (Ill. Ct. App. 1994). However, "[i]n Illinois . . . where the conduct of a defendant in an interference with contract action was privileged, it is the plaintiff's burden to plead and prove that the defendant's conduct was unjustified or malicious." *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 545 N.E.2d 672, 677 (Ill. 1989). Thus, as the Illinois Supreme Court noted, the

threshold question on the burden of proof is whether the defendant's conduct is privileged. *See id.* ("Therefore, before we can determine who has the burden of pleading justification (or a lack thereof), we must first decide whether the defendants' conduct here was protected by a privilege.").

The Illinois Supreme Court "will recognize a privilege in intentional interference with contract cases where the defendant was acting to protect an interest which the law deems to be of equal or greater value than the plaintiff's contractual rights." *Id.* (citing *Swager v. Couri*, 395 N.E.2d 921, 927 (Ill. 1979)). The Illinois Supreme Court has repeatedly

> recognized a privilege for corporate officers and directors to use their business judgment and discretion on behalf of their corporations. The existence of the privilege was based upon [the] recognition that the duty of corporate officers and directors to their corporations' shareholders outweighs any duty they might owe to the corporations' contract creditors.

*Id.* at 677; *see also Swager*, 395 N.E.2d at 927 (privilege of corporate officer to exercise "business judgment and discretion" applies to decision to dissolve entity); *H.F. Philipsborn & Co. v. Suson*, 322 N.E.2d 45, 50 (Ill. 1974) (privilege of corporate officer to obtain loan with better terms than in allegedly broken contract); *Loewenthal Secs. Co. v. White Paving Co.*, 184 N.E. 310, 315 (Ill. 1932) (privilege of corporate officer to refuse to bid on work in attempt to force creditor to waive contractual rights). In addition, the Court has extended that reasoning to recognize a privilege for hospital management to their hospital. *See HPI Health Care Servs.*, 545 N.E.2d at 677 (privilege of hospital managers to decline to pay hospital's contract creditors).

The district court noted that Illinois law is "less than clear" on the issue of burdens of proof on justification. Attempting to traverse the legal confusion, the district court held:

> First, if Marathon's prima facie case must follow the elements of tortious interference, as stated by the *HPI* Court, then Marathon

8

has the burden of proving a lack of justification as part of its case. Second, even if Marathon only bears the burden of proving the lack of justification when "privilege" is established by the complaint, the Court finds Marathon's complaint establishes the issue of privilege. Third, even if Marathon's complaint does not establish "privilege" and justification is Ford's burden—as an affirmative defense—the Court finds that Ford has established such a defense and that Marathon has failed to show the existence of a genuine issue of material fact in rebuttal.

The district court went on to conclude that the factual allegations in Marathon's complaint established Ford's privilege because Marathon alleges that "Defendants have no justification or privilege for interfering with any of these contracts or relationships," and a section of the complaint was titled "There is No Legitimate Business Reason or Justification For Defendants' Conduct," in which "Marathon alleges facts to imply a lack of justification or legitimate business judgment."

The approach employed by the district court, and discussed by one Illinois Court of Appeals, in which the mere allegation in the complaint that the defendant acted without privilege then serves to "introduce" privilege, misses the mark.[3] *See Zdeb v. Baxter Int'l, Inc.*, 697 N.E.2d 425, 433 (Ill. App. Ct.1998) (criticizing *Roy v. Coyne*, 630 N.E.2d 1024 (Ill. App. Ct. 1994)).

Application of the proper privilege analysis, however, results in the same outcome. Ford's actions fall squarely within the parameters of the Illinois Supreme Court's caselaw on corporate officer privilege. Here, Ford's officers and directors made the decision regarding the rating change in accordance with their business judgment and the company benefitted from the challenged action. As the Illinois Supreme Court has observed, "[t]he situation alleged here does not present an instance of 'outsiders intermeddling maliciously in the contracts or

---

[3] The district court utilized the approach outlined in *Roy v. Coyne*, 630 N.E.2d 1024 (Ill. App. Ct. 1994). However, the *Roy* approach has not been adopted or addressed by the Illinois Supreme Court.

affairs of other parties.'" *Fellhauer v. City of Geneva*, 568 N.E.2d 870, 880 (Ill. 1991) (quoting *Loewenthal Secs. Co.*, 184 N.E. at 310)).

Thus, because "the conduct of [Ford] was privileged, it is the plaintiff's burden to plead and prove that the defendant's conduct was unjustified. . . ." *HPI Health Care Servs.*, 545 N.E.2d at 677. On that basis, the district court did not err in ruling that *HPI* required Marathon to negate justification.

### B. Ford's Justification

The Court reviews *de novo* a grant of summary judgment. *Croft v. Governor of Texas*, 562 F.3d 735, 742 (5th Cir. 2009). The Court affirms the district court's judgment if the record reveals no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. *Id*. When conducting its review, the Court evaluates the evidence in the light most favorable to the non-movant. *Breaux v. Halliburton Energy Servs.*, 562 F.3d 358, 364 (5th Cir. 2009).

Marathon argues that Ford was not "justified" as a matter of law because it was insufficient for Ford to claim that Marathon had no evidence to prove lack of justification. Marathon alleges that Ford willfully and intentionally devised a plan that would necessarily disrupt the contractual relationships of outside VSC providers and their insurers, including Marathon and API, and the A-rating was instituted in order to drive RRGs out of the market. According to Marathon, if Ford had a benign intent, it would have considered each RRG separately, or at least would have considered the time necessary for qualification for the A- rating.

In favor of affirming that it was justified as a matter of law, Ford argues that its actions were justified business decisions and no evidence exists to the contrary, and Marathon produced no evidence to carry its burden or negate Ford's evidence.

In order to prevail on an Illinois claim for intentional interference with contractual relations, the plaintiff must show that: (1) there was an enforceable contract; (2) the defendant was aware of that contract; (3) the defendant intentionally and unjustifiably induced a breach of the contract; (4) breach resulted from the defendant's wrongful conduct; and (5) the plaintiff has been damaged. *Smock v. Nolan*, 361 F.3d 367, 372 (7th Cir. 2004) (citing *HPI Health Care Servs.*, 545 N.E.2d at 676).

With respect to justification, "[a] defendant who is protected by a privilege . . . is not justified in engaging in conduct which is totally unrelated or even antagonistic to the interest which gave rise to defendant's privilege." *HPI Health Care Servs.*, 545 N.E.2d at 677. Additionally, upon examining "the privilege of corporate officers to act on behalf of a corporation in accordance with their business judgment," the Illinois Supreme Court determined that "if the company benefitted from the challenged action of the corporate officer in breaking the contract, the officer . . . could not be liable in tort." *Fellhauer,* 568 N.E.2d at 878-79.

As discussed above, Marathon has the burden to demonstrate Ford's lack of justification. *HPI* establishes that the defendant's lack of justification is one of the required elements in Marathon's intentional interference claim.

*Celotex* states the fundamental guidelines governing summary judgment:

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is "entitled to a judgment as a matter of law" because the nonmoving party has failed to make a sufficient

showing on an essential element of her case with respect to which she has the burden of proof.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *see also St. Paul Mercury Ins. Co. v. Williamson*, 224 F.3d 425, 440 (5th Cir. 2000) ("Before the non-moving party is required to produce evidence in opposition to the motion, the moving party must first satisfy its obligation of demonstrating that there are no factual issues warranting trial."). Therefore, Ford's proffer of evidence in addition to pointing out Marathon's lack of evidence is a proper basis for summary judgment.

Ford has presented abundant uncontroverted evidence of justification. A sample of such evidence includes:

- Ford's decision making process following the NWIC bankruptcy, which prompted a thorough review of Ford's policies for the financing of transactions that included VSCs. Ford recognized that the bankruptcy of a VSC provider raised significant issues for consumers, dealers, and Ford as a whole. If the dealer honored the contracts, it would absorb the cost of repairs. If it did not honor the contracts, the dealer and Ford faced the prospect of angry customers who, in the future, would take their business elsewhere or would stop making payments on the vehicle. The NWIC bankruptcy exposed flaws in relying on a reinsurance arrangement. Concerned about the effects of such a bankruptcy, Ford determined that it would no longer finance transactions that included the sale of a VSC unless the VSC was insured by carrier with an A.M. Best rating of A- or better.

- Ford rejected Marathon's proposal to offer a letter of credit because it did not believe that it had the manpower or skill set to monitor the letter of credit adequately or to review Marathon's financial status periodically.

- Allen Kreke, Marathon's Chief Executive Officer, testified that terms requiring an A- rating by A.M. Best were "pretty much established in the industry" in such contracts and "relatively standard terms."

- Marathon's industry expert, Kurt Schwamberger, testified as follows:

  Q: And you had either the option to do business with a hundred A.M. Best rated companies or go through the process of analyzing the letters of credit from 100 unrated, we'll take RRGs, which would you prefer?

  A: If I didn't have the resources, I would have to go with the A.M. Best rated companies.

  Q: And ultimately it's a business decision that [Ford] or any other company would make.

  A: I don't think that would be an unrealistic decision to make.

- Ford had neither the personnel nor internal expertise to duplicate the type of financial review performed by A.M. Best. It could not take on the constant monitoring necessary to ensure that VSC providers continued to be insured by companies on sound financial footing.

Marathon disputed none of this evidence. The evidence supports a finding that Ford's decision regarding changing the rating requirement was based on business considerations—particularly in light of the NWIC bankruptcy problems.

Although Marathon vehemently insists that Ford "willfully and intentionally devised a plan that would necessarily disrupt the contractual relationships of outside VSC providers and their insurers, including Marathon and API," it provides no evidence that Ford lacked justification. In support of its claims, Marathon asserts that John Hanlon, Director of Ford Credit's Global Process Management department, admitted that management discussed that the A- rating requirement might have the effect of removing some RRGs from the marketplace. Marathon also points to the statements of Larry King, the Director

of Ford's VSC business, in which he admitted that he informed dealers that there were risks associated with using RRGs in order to get more business.

The portion of Hanlon's deposition that Marathon relies upon merely establishes Ford was aware that the rating change might cut many RRGs out of the marketplace for Ford-backed financing of Ford vehicles, "to the extent that they couldn't or wouldn't meet the standard of getting, of submitting whatever was required to A.M. Best in obtaining the requisite rating." This knowledge is undisputed; the fact that Ford contemplated a possible outcome of a business decision does not, as Marathon asserts, "compel the conclusion that Ford knew, and intended, that the A- edict would stop performance of the AMI/Marathon contract. . . ."

The only other concrete evidence proffered by Marathon is the testimony of King, who stated in his deposition:

Q: What did you mean when you say 'scare some of our dealers?'

A: We would basically show them that there are risks associated with writing these companies' vehicle service contracts.

The questioning was as to why King, upon receiving notice that another RRG was in trouble, forwarded that information on to dealers. He admitted that he hoped that information would help get more business. However, seeking to gain a competitive advantage in this manner would not be "totally unrelated or even antagonistic to the interest which gave rise to [Ford's] privilege," *HPI Health Care Servs.*, 545 N.E.2d at 677, because "the company [would benefit] from the challenged action. . . ." *Fellhauer*, 568 N.E.2d at 878-79.[4]

---

[4] Ford also notes that even if the rating change was for competitive advantage, which it maintains was not the case, it would fall within the "competitor's privilege" under the Restatement (Second) of Torts § 768. *See Prudential Ins. Co. of Am. v. Sipula*, 776 F.2d 157, 162 (7th Cir. 1985) (noting in dicta that, under Illinois law, "[a] defendant's inducement of the cancellation of an at-will contract constitutes at most interference with a prospective economic advantage, not interference with contractual relations").

The summary judgment evidence also demonstrates that Ford did not implement the credit rating change to steal Marathon's business. In fact, API found another insurer that met the rating requirement and continued to do business with Ford. Further, Marathon's insistence that "the A- rating was instituted in order to drive RRGs out of the market, because a benign intent would have considered each RRG separately" essentially demands that Ford should be required to, "on an individual basis," determine if there was good cause to deny financing for each insurer of VSCs. As Ford contends, that's exactly what it did. Those insurers that met the A- standard continued to be financed, and those that did not meet the standard were declined. Based on this "individual" information, Ford decided that Marathon was not worth the risk.

Thus, Marathon has—as the district court held—"proffer[ed] absolutely no evidence . . . ." Therefore, the district court's grant of summary judgment was appropriate based on Ford's justification as a matter of law.[5]

## C. Denial of Additional Discovery

"The standard of review poses a high bar; a district court's discretion in discovery matters will not be disturbed ordinarily unless there are unusual circumstances showing a clear abuse." *Seiferth v. Helicopteros Atuneros, Inc.*, 472 F.3d 266, 276 (5th Cir. 2006) (internal quotations and citations omitted). This court will disregard a district court's discovery error unless that error affected the "substantial rights of the parties." *Dresser-Rand Co. v. Virtual Automation Inc.*, 361 F.3d 831, 842 (5th Cir. 2004); *United States v. Garcia*, 567 F.3d 721, 734 (5th Cir. 2009). The burden of proving substantial error and prejudice is upon the appellant. *Id.* (citing *Bell v. Swift & Co.*, 283 F.2d 407, 409 (5th Cir. 1960)).

---

[5] Ford alternatively argues that summary judgment is appropriate because, under Illinois law, there was allegedly no termination or breach of contract. Because we affirm on the justification issue, we do not reach Ford's alternative arguments.

Marathon maintains that the district court abused its discretion by denying its request to reopen discovery for two limited purposes: to resume the deposition of two Ford executives, and to require the production of relevant financial data. The first request was allegedly due to the late production of documents by Ford, after the depositions had been taken. Marathon asserts that the documents implicated executives in a top-level meeting that focused on finding means of enhancing the lagging sales of Ford's VSCs. The second request involved a Rule 30(b)(6) request made by Marathon for information regarding Ford's revenues from its VSC sales between 2002-2007, that Ford objected to producing and then produced just three days before the dispositive hearing.

Ford argues that Marathon failed to show good cause for reopening discovery because: (1) Marathon has waived the issue by failing to appeal the trial court's denial of a motion to reopen discovery that covered the exact same material that it now claims was improperly denied; (2) the trial court's grant of summary judgment on the interference claim resolves this issue; and (3) denial of Marathon's motion to reopen discovery made five months after the discovery cutoff and on the eve of trial was not an abuse of discretion.

Marathon fails to explain how the discovery that it seeks bears on the grant of summary judgment on the justification issue. While Marathon claims that it needs to reopen two depositions because there was "a top-level meeting dealing with a significant emphasis on increasing the sales of Ford's VSC products," it never demonstrates how such evidence would show a lack of justification for the rating requirement change.

As discussed above, the corporate officer privilege encompasses virtually all decisions benefitting the company. *See Fellhauer*, 568 N.E.2d at 878-79 ("if the company benefitted from the challenged action of the corporate officer in breaking the contract, the officer . . . could not be liable in tort"). All for-profit businesses can be assumed to desire increased sales. That Ford would attempt

to increase VSC sales is not probative of a lack of justification, and Marathon cites no authority suggesting that such evidence could support an inference of lack of justification.

Similarly, Marathon's demand for revenue information has no bearing on the judgment. Marathon has failed to identify any nexus between the requested information and its inability to withstand Ford's Motion for Summary Judgment.

## D. Denial of Leave to File Fifth Amended Complaint

The denial of a motion to amend is reviewed for abuse of discretion. *See Ayanbadejo v. Chertoff*, 517 F.3d 273, 276 (5th Cir. 2008).

Marathon insists that the district court abused its discretion by denying Marathon's request to file a Fifth Amended Complaint. In its Order partially granting Ford's Motion to Dismiss, the district court had ruled that "no set of facts" would support Marathon's claim for Ford's interference with Marathon's prospective business relationship with API. Based on evidence obtained in discovery, Marathon sought to set aside the court's ruling on the motion to dismiss and to amend its complaint to reassert that claim.

Ford urges this court to affirm the district court's ruling because the grant of summary judgment on the justification element of Marathon's contractual interference claim also resolves Marathon's motion to amend to add a prospective claim, and denial of the motion to amend was well within the trial court's discretion because Marathon failed to show good cause for not seeking leave to amend before the deadline to amend the pleadings.

Federal Rule of Civil Procedure 16(b) governs amendment of pleadings after a scheduling order's deadline to amend has expired. *Fahim v. Marriott Hotel Servs., Inc.*, 551 F.3d 344, 348 (5th Cir. 2008). Rule 16(b) provides that once a scheduling order has been entered, it "may be modified only for good cause and with the judge's consent." Fed. R. Civ. P. 16(b). It requires a party "to show that the deadlines cannot reasonably be met despite the diligence of the

party needing the extension." *S&W Enters., LLC v. Southtrust Bank of Ala., NA*, 315 F.3d 533, 535 (5th Cir. 2003) (internal citations omitted). Four factors are relevant to good cause: "(1) the explanation for the failure to timely move for leave to amend; (2) the importance of the amendment; (3) potential prejudice in allowing the amendment; and (4) the availability of a continuance to cure such prejudice." *Sw. Bell Tel. Co. v. City of El Paso*, 346 F.3d 541, 546 (5th Cir. 2003) (citing *S&W Enters.*, 315 F.3d at 536).

The trial court acted well within its discretion in denying Marathon's motion for leave to file its Fifth Amended Complaint. The trial court dismissed Marathon's interference with a prospective business relationship claim on March 28, 2006, and denied it leave to replead those allegations. On April 18, 2007, the court entered a scheduling order pursuant to Rule 16, setting September 3, 2006 as the deadline for amending the pleadings.

Marathon has offered no legitimate explanation for its delay in seeking leave to amend. Marathon's primary argument is that the district court erred by dismissing its interference with a prospective business relationship claim on March 28, 2006. Marathon was aware of the amendment deadline, but at no time before July 2008 did Marathon either seek leave to refile its dismissed claim or otherwise request relief from the March 28, 2006 order. Marathon sought leave to reassert the dismissed claim 28 months after the claim had been dismissed, 22 months after the deadline for amending the pleadings, after the close of discovery, and six weeks before the then-scheduled trial (after a continuance). Marathon knew or should have known of the effect of the trial court's order, and had ample opportunity to revisit the issue well before the eve of trial. The district court properly denied leave to amend at that late date.

## CONCLUSION

For the foregoing reasons, the district court's grant of summary judgment in favor of Ford is AFFIRMED.